**2024 IL 127838**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 127838)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ANGELO CLARK, Appellant.

*Opinion filed December 19, 2024.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

Justice Neville dissented, with opinion.

## OPINION

¶ 1    The State, by indictment, charged defendant Angelo Clark with multiple counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)) and aggravated battery (*id.* § 12-3.05(e)(1)), arising out of a gang-related shooting that seriously injured two people at an outdoor gathering held on July 19, 2013.

Defendant moved to quash his arrest, which was effected pursuant to an investigative alert—a computer notification to officers in the field that detectives had found probable cause for defendant's arrest—issued by the Chicago Police Department. Following defendant's arrest, he made an inculpatory statement. After a hearing, the circuit court denied defendant's motion to quash arrest and suppress his statement. Defendant did not contest the denial in the circuit court.

¶ 2        Thereafter, following a 2017 jury trial in the circuit court of Cook County, defendant was convicted, under an accountability theory, of two counts of aggravated battery with a firearm (*id.*) and was initially sentenced to two consecutive terms of 23 years in prison. Upon an amended motion to reconsider his sentence, the circuit court reduced the aggregate sentence from 46 years to 32 years in prison.

¶ 3        Defendant appealed, and the Appellate Court, First District, affirmed defendant's conviction and sentence. 2021 IL App (1st) 180523-U. We allowed defendant's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Oct. 1, 2021)), and for the following reasons, we affirm the appellate court's judgment.

¶ 4                                    BACKGROUND

¶ 5        On July 19, 2013, at approximately 7:30 p.m., two people attending an outdoor event, a 6-year-old girl and a 52-year-old woman, were shot and injured. Shortly after the shooting, police pulled over Cragg Hardaway a few blocks from the crime scene after his vehicle was identified as possibly having been involved. He was arrested the next day, and on the following morning, July 21, 2013, he gave a video-recorded statement. In his statement, he told detectives that, shortly after he heard gunshots on the day of the shooting, he encountered DeAndre Butler, who got in Hardaway's car and told him that some younger men had shot at someone. Three young men—Terrence Lynom, Ladon Barker, and defendant—then ran to Hardaway's car, got in, and told Butler they had committed the shooting and believed Lynom had successfully killed someone. Hardaway later testified to the grand jury that he encountered defendant again about a half hour later, when defendant reported to Butler that he had disposed of the guns. After Hardaway's video-recorded statement, the detectives issued investigative alerts notifying

officers that there was probable cause to arrest Lynom, Barker, and defendant. On July 22, 2013, between noon and 3:30 p.m., officers arrested defendant.

¶ 6    Before trial, defendant filed a motion to quash arrest, contending that he was arrested without probable cause or a valid arrest warrant. At the hearing on the motion, Lashan Clark, defendant's mother, testified that at approximately 3 p.m. on July 22, 2013, she was in her mother's home when two police officers arrived looking for defendant, who was not there. Ms. Clark testified that she voluntarily accompanied the officers to her sister's South Lafayette Avenue residence, where she said defendant was living. Ms. Clark testified that, after she and the officers arrived at her sister's residence, she told the officers to wait outside, she entered the back door, and she saw defendant sitting at the kitchen table. Ms. Clark testified that she told defendant that the police were there "about a little girl" and that it was serious and that defendant "was getting mad" because the police were there. Ms. Clark testified that, while she and defendant were talking, the officers entered the house and threatened to tase defendant. Ms. Clark testified that the officers then choked defendant, threw him against the wall, and handcuffed him. Ms. Clark testified that the officers then escorted defendant from the home.

¶ 7    Chicago police officer Patrick Kinney[1] testified that on July 22, 2013, he and his partner, Chicago police officer Kevin O'Neill, went to defendant's grandmother's house after receiving an investigative alert that there was probable cause to arrest defendant for the shooting of two victims. Officer Kinney believed that the basis for the probable cause for the investigative alert was that defendant had been "positively identified as being the shooter where two victims were shot."

¶ 8    After learning that there was an investigative alert with probable cause to arrest defendant, Kinney performed a database search on defendant's name and went to the residence of the first address that appeared. Kinney testified that, at that residence, they encountered Ms. Clark, who was "extremely" cooperative, informed them that defendant lived with her sister, and accompanied the officers to her sister's house at South Lafayette Avenue. Kinney testified that, when they arrived at the sister's address, Kinney approached the back of the residence, O'Neill

---

[1] The report of proceedings in the record spells Officer Kinney's name as "Kenny," but the parties below, the arrest report contained in the common-law record, and the appellate court spell his name "Kinney."

approached the front, and Ms. Clark waited in the back of the police car in front of the residence.

¶ 9        Kinney testified that he knocked on the door and a male adult in his twenties answered it. Kinney introduced himself to the young man and explained that he was looking for defendant, whom he had probable cause to arrest. Kinney testified that, although the man did not verbally invite Kinney inside, the man opened the door, moved to the side, and pointed to a back bedroom where Kinney saw defendant. Kinney, who remained outside the residence, told defendant that there was a probable cause investigatory alert for his arrest and that the detectives wanted to speak to him, and Kinney asked defendant to accompany him to the police station. Defendant said, "Okay, let me get some clothes," after which Kinney stepped inside the residence and defendant put on his clothes. Kinney testified that he entered into the house as defendant gathered his clothing "to have eyes on him prior" to arresting him because he did not "know what he was going to grab." Kinney testified that defendant was very cooperative, defendant exited the home, and he placed defendant under arrest and escorted him to the police station.

¶ 10        The circuit court denied defendant's motion. In doing so, the circuit court found that Kinney was a "believable" and "compelling" witness and that Ms. Clark's testimony was biased and "utterly without any credibility." The court stated that it agreed with defense counsel that the existence of an investigative alert with probable cause to arrest does not alone provide authorization for an officer to enter a home to effect an arrest. The circuit court noted, however, that Kinney's eventual entry occurred after defendant had "already agreed to accompany" the officers and it was not "to effect arrest but to effect and facilitate his accompaniment, which [defendant] [had] already agreed to do."

¶ 11        After defendant's arrest, he submitted a written statement to police, wherein he stated that he was a member of the Goon Town gang, rivals of the 10-4Ls gang, and that he and about 10 fellow gang members, including Lynom and Barker, decided they would shoot some 10-4Ls. Lynom and Barker volunteered to shoot, and defendant volunteered to go along with them to make sure they were alright. Once Barker was armed with a 9-millimeter gun and Lynom with a .40-caliber gun, they walked through the alley, and Barker and Lynom opened fire while defendant

- 4 -

stayed near the alley's entrance. The three then ran back down the alley and escaped in Hardaway's car.

¶ 12        At defendant's jury trial, the State proceeded on three counts of aggravated battery and five counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)). Codefendants, Lynom and Barker, were tried separately and are not parties to this appeal. At defendant's trial, the State presented evidence that defendant was the lookout for the two shooters and was therefore accountable for their actions. The jury returned guilty verdicts on two counts of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)) under an accountability theory. The circuit court declared a mistrial on the remaining counts of attempted first degree murder and the sentence enhancement for the use of a firearm, on which the jury could not reach a unanimous verdict.

¶ 13        In December 2017, at the sentencing hearing, the circuit court heard the victims' statements about their lasting injuries and defendant's statement in allocution that he was "no longer that reckless 17[-]year[-]old kid" and was "truly sorry" that "the offense [he] was charged with" had "caused two innocent people pain and suffering every night plus [his] family." Defendant's statement in allocution indicated that he started getting into trouble when he returned to Chicago from Wisconsin, his surroundings led him to "the street life," and he never planned "to be part of some nonsense." Defendant's statement indicated that he was "past [his] adolescent state of mind," "a mature adult now 21 years old," and "would have been dead if [he] [were] free due to [his] adolescent state of mind." Defendant's statement indicated that he was part of a spiritual program and wanted to attend college.

¶ 14        The circuit court also received a presentence investigation report (PSI), which confirmed that defendant was 17 at the time of the shooting, revealed that he had been adjudicated delinquent for aggravated assault a month before the shooting, and provided information about defendant's social, family, and psychological history. The PSI revealed that, when defendant was 15 years old, he suffered from depression, attempted suicide by hanging himself, and was hospitalized for two weeks. The PSI revealed that defendant denied being a gang member or being involved in any gang-related criminal activity, even though he had "Goon Town" tattooed on the knuckles of both hands.

¶ 15        In mitigation, defense counsel argued that defendant was "just a child," never had the opportunity to go to high school because he was working when he was 15 years old, and "was only a little over 10 years older than the victim." Counsel stated that defendant had a "tough life" and grew up without his dad in his life. Counsel stated that defendant "did not have direction" and had "no one to show him the way," and counsel requested that "be factored in greatly" for sentencing.

¶ 16        Before sentencing defendant, the court explained that it had considered "[t]he evidence presented at trial," the PSI (which the court had "reviewed in its entirety"), "the evidence offered in aggravation and mitigation," and the statutory factors in aggravation and mitigation, as well as arguments of counsel, the victim impact statements, and "[d]efendant's allocution" (which "provide[d] [the court] with some degree of optimism"). After noting the "extreme gravity" of the conduct for which defendant had been found accountable and defendant's eligibility for a 6- to 30-year sentence on each count of aggravated battery with a firearm, the circuit court sentenced him to 46 years in prison, which included two consecutive sentences of 23 years. The circuit court denied defendant's immediate oral motion to reconsider based on his youth, explaining that it was "mindful of [his] youth" but that other factors, including the "extremely aggravating" facts that the offenses resulted from a "concerted effort" by defendant and his fellow gang members, supported the sentence.

¶ 17        In January 2018, defendant filed an amended motion to reconsider sentence, arguing that 46 years was excessive in light of defendant's background, young age, and the nature of his participation in the offense, including that he had not fired a gun during the shooting. On February 16, 2018, at the hearing on the amended motion to reconsider, defendant argued that the 46-year sentence was excessive and "akin to a life sentence" because he was a 17-year-old boy at the time of the offense, he was not the shooter, and he was found to be guilty only of aggravated battery with a firearm, not attempted murder. The circuit court reiterated that it was "mindful of the fact that he is a young person" and, after "tak[ing] that into further account," reduced defendant's sentence to 32 years total, with 16 years in prison on each count of aggravated battery with a firearm. After the circuit court reduced defendant's sentence, the court noted that defendant "absented himself from the courtroom" and "pushed the officer aside as he attempted to exit." The circuit court found that defendant "was obstreperous, even in his final moments before the

[c]ourt," which was "noteworthy" because defendant had "acted violently and in a disruptive way on many occasions within [the] courtroom."

¶ 18    Defendant filed his timely notice of appeal.

¶ 19                                    Appellate Court

¶ 20    The appellate court affirmed defendant's convictions and sentence. 2021 IL App (1st) 180523-U, ¶ 1. On appeal, relying on the appellate court's opinion in *People v. Bass*, 2019 IL App (1st) 160640, ¶¶ 62, 71, *aff'd in part and vacated in part*, 2021 IL 125434, ¶ 34, before *Bass* reached this court, defendant argued, as relevant here, that the circuit court erred by failing to quash his arrest and suppress his following statement because his arrest was prompted by an investigative alert and not an arrest warrant. In *Bass*, a divided panel of the appellate court had held that the defendant's motion to suppress should have been granted because arrests based solely on investigative alerts, even if the alert is based on probable cause, violate the Illinois Constitution. *Id.* ¶¶ 7, 42, 71. In addressing defendant's argument, the appellate court in this case noted that defendant had not argued on appeal that the officers lacked probable cause to arrest him. 2021 IL App (1st) 180523-U, ¶ 82.

¶ 21    The appellate court also noted that after briefing had completed, in April 2021, this court filed an opinion in *Bass*, agreeing with the appellate court that the defendant's motion to suppress should have been granted, but this court reached that conclusion on narrower grounds, finding that the traffic stop at issue was unconstitutionally extended. *Id.* ¶ 83 (citing *People v. Bass*, 2021 IL 125434, ¶ 26). Because this court decided the case on narrower grounds, it did not address the constitutional issue regarding whether investigative alerts violate the Illinois Constitution, and this court vacated the portions of the appellate opinion relating to investigatory alerts. *Bass*, 2021 IL 125434, ¶¶ 29, 33.

¶ 22    Thus, following its own precedent (*People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39; *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50; *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 63), the appellate court in this case was unpersuaded by defendant's argument that his arrest was unconstitutional because he was arrested pursuant to

- 7 -

an investigative alert that violated the Illinois Constitution. 2021 IL App (1st) 180523-U, ¶ 84. The appellate court therefore held that the circuit court did not err when it denied defendant's motion to quash arrest and suppress his statement. *Id.*

¶ 23    Defendant also argued on appeal that the circuit court improperly failed to consider the sentencing factors listed in the Unified Code of Corrections (Code) that are applicable when sentencing individuals under the age of 18 at the time of the commission of an offense (730 ILCS 5/5-4.5-105(a) (West 2016)). 2021 IL App (1st) 180523-U, ¶ 124. Section 5-4.5-105(a) of the Code first became effective January 1, 2016,[2] yet defendant did not raise it prior to appeal.

¶ 24    Accordingly, due to defendant's forfeiture of the issue, the appellate court reviewed the issue under plain error principles and found no plain error. *Id.* ¶¶ 130-37. The appellate court held that section 5-4.5-105(a) of the Code did not apply to defendant's sentencing because defendant committed his offenses prior to its effective date and, in any event, the circuit court had considered the relevant factors listed. *Id.* The appellate court rejected defendant's assertion that, even though the circuit court was "mindful" of his young age at the time of the offense, the circuit court had not considered the specific factors relative to youth set forth in section 5-4.5-105 of the Code. *Id.* ¶ 135. The appellate court held that the circuit court was not required to recite and assign value to each sentencing factor, nor was it required to articulate the process it used to determine an appropriate sentence. *Id.* Accordingly, the appellate court concluded that the circuit court had considered the relevant factors and did not abuse its discretion when it sentenced defendant. *Id.* ¶ 137.

¶ 25    Presiding Justice Mikva concurred in part and dissented in part, noting that she would have affirmed defendant's convictions but would have remanded for resentencing because the circuit court did not expressly discuss the statutory mitigating factors at sentencing. *Id.* ¶ 143 (Mikva, P.J., concurring in part and dissenting in part). Presiding Justice Mikva asserted that the circuit court was obligated to consider the factors imposed on individuals under the age of 18 (730

---

[2]Pursuant to the Effective Date of Laws Act (5 ILCS 75/0.01 *et seq.* (West 2014)), because the underlying bill was "passed" prior to June 1, 2015 (see 5 ILCS 75/3 (West 2014)), the effective date for Public Act 99-69 was January 1, 2016 (see 5 ILCS 75/1(a) (West 2014)). Ill. Const. 1970, art. IV, § 10; *People v. Hunter*, 2017 IL 121306, ¶ 7 n.1.

ILCS 5/5-4.5-104(a) (West 2016)) because the circuit court was reconsidering the originally imposed *de facto* life sentence. 2021 IL App (1st) 180523-U, ¶ 146. Citing this court's decision in *People v. Buffer*, 2019 IL 122327, ¶ 47, Presiding Justice Mikva found the circuit court's statements insufficient to suggest that the relevant factors were considered and would have remanded to apply those factors and resentence defendant. 2021 IL App (1st) 180523-U, ¶ 149-50.

¶ 26        This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021). We allowed the ACLU of Illinois, Chicago Appleseed Center, Chicago Council of Lawyers, and National Association for Criminal Defense Attorneys to file a joint brief as *amici curiae* in support of defendant's position. We also allowed the City of Chicago, the Illinois Sheriffs' Association, the Illinois Association of Chiefs of Police, the Village of Bannockburn, the City of Crystal Lake, the Village of Glenview, and the Village of Grayslake to file briefs as *amici curiae* in support of the State's position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). All of the *amici* briefs involve the constitutionality of investigatory alerts.

¶ 27                                    ANALYSIS

¶ 28                             Investigative Alerts

¶ 29        Defendant contends that the investigative alert system used by the Chicago Police Department, wherein the police entered and retrieved a notice in a database that identified defendant as one whom there was probable cause to arrest, was inconsistent with the United States and Illinois Constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6) and, thus, the circuit court erred in failing to grant his motion to quash arrest and suppress evidence. Defendant requests this court to reverse the appellate court's judgment affirming his convictions and remand for a new trial.

¶ 30        "In reviewing a ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review." *People v. Grant*, 2013 IL 112734, ¶ 12. "While we accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence, we review *de novo* the court's ultimate ruling on a motion to suppress involving probable cause." *Id.*

¶ 31　　With regard to his motion to quash arrest, defendant's arguments throughout this case have shifted. In his brief submitted to this court, defendant argues that under the federal and state constitutions, absent exigent circumstances or consent, police must, whenever possible, obtain an arrest warrant issued by a neutral magistrate upon a finding of probable cause prior to effectuating an arrest in the home. We agree with this proposition. Absent exigent circumstances or consent, officers may not effect a warrantless arrest in the home. *Payton v. New York*, 445 U.S. 573, 590 (1980) (absent exigent circumstances, fourth amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest).

¶ 32　　We note, however, that at no time after the hearing on the motion to suppress did defendant argue in the circuit court that the State had failed to prove voluntary consent to enter the home to effect the defendant's arrest, despite the circuit court's finding otherwise. Defendant did not argue in posttrial motions before the circuit court, on appeal from the order denying his motion to suppress, or in his petition for leave to appeal in this court that the State failed to prove voluntary consent to enter the home to effect defendant's arrest in violation of *Payton*. See *People v. Bean*, 84 Ill. 2d 64, 69 (1981) ("when voluntary consent is given to enter one's residence and an arrest is effected based on probable cause, the suspect's rights under the fourth amendment are not violated, even in the absence of exigent circumstances"); see also *id.* at 69-70 (consent may be given by arrestee or third party (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974))).

¶ 33　　Accordingly, after the hearing on the motion to quash arrest and suppress evidence, defendant forfeited any argument that the State failed to prove that the officers, at the threshold of the home at daylight using no force or deception (*People v. Bonilla*, 2018 IL 122484, ¶ 20 (police officer not armed with a warrant may approach home and knock, as any private citizen might do (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)))), had acquired proper consent to enter the residence to effectuate defendant's arrest. See *People v. Brown*, 236 Ill. 2d 175, 183 (2010) (issue may be deemed forfeited if not raised in the petition for leave to appeal); *People v. Phillips*, 215 Ill. 2d 554, 565 (2005) (failure to argue point in appellant's opening brief results in forfeiture of issue); *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005) (in general, failure to raise issue in posttrial motion results in forfeiture of that issue on appeal). Because defendant did not previously raise this issue, the

appellate court did not address it, and we therefore decline to overlook defendant's forfeiture of it. We caution, however, that *Payton* remains good law and, despite our holding below, that probable cause supports a warrantless arrest even if communicated via an investigatory alert, the fourth amendment nevertheless prohibits police officers from making a warrantless entry into the home to make a routine felony arrest, absent exigent circumstances or consent. See *Payton*, 445 U.S. at 590.

¶ 34    After the appellate court's 2019 holding in *Bass*, defendant argued for the first time in the appellate court that, pursuant to *Bass*, the circuit court erred in denying his motion to quash arrest because "the unwarranted arrest was made pursuant to an investigative alert [with] probable cause attached." Likewise, in his petition for leave to appeal to this court, defendant argued the police "effectuated an unconstitutional arrest by relying on a police investigative alert." Although defendant also forfeited this argument by failing to preserve it in the circuit court by challenging the denial of his motion to quash in a posttrial motion (*People v. Cosby*, 231 Ill. 2d 262, 271-73 (2008) (challenges to denial of motion to suppress at trial, constitutional or otherwise, are forfeited if not raised in a posttrial motion)), we nevertheless address defendant's contention, raised and addressed in the appellate court and raised in this court, that his statement should be suppressed because he was arrested pursuant to an investigative alert, not a warrant based on probable cause, pursuant to the appellate court's reasoning in *Bass*, 2019 IL App (1st) 160640, ¶¶ 62, 71, *aff'd in part and vacated in part*, 2021 IL 125434, ¶ 34. See *People v. Sophanavong*, 2020 IL 124337, ¶ 21 (forfeiture is a limitation on the parties and not on the court, and a court may overlook forfeiture where necessary to reach a just result or maintain a sound body of precedent). Upon review, we find no error.

¶ 35    We begin by briefly reviewing the law related to warrantless arrests based on probable cause. In *United States v. Watson*, 423 U.S. 411 (1976), the United States Supreme Court held that a warrantless arrest based on probable cause complies with the fourth amendment, even if there was time to obtain an arrest warrant. The court explained that "there is nothing in the Court's prior cases indicating that under the Fourth Amendment a warrant is required to make a valid arrest for a felony." *Id.* at 416-17. Thus, "[t]he necessary inquiry *** was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the

arrest." *Id.* at 417. The court noted that this was an "ancient common-law rule" and traced it back to at least the time of Blackstone. *Id.* at 418. The court further noted that this was the prevailing rule under state constitutions and statutes as well. *Id.* at 419. The court explained why it was continuing to adhere to this rule:

> "Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. See *United States v. Ventresca*, 380 U. S. 102, 106 (1965); *Aguilar v. Texas*, 378 U. S. 108, 111 (1964); *Wong Sun v. United States*, 371 U. S. 471, 479-480 (1963). But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like." *Id.* at 423-24.

¶ 36 In Illinois, the legislature has placed warrantless arrests based on probable cause on equal footing with arrests made pursuant to warrants. Section 107-2(1) of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-2(1) (West 2012)) provides as follows:

> "A peace officer may arrest a person when:
>
> (a) He has a warrant commanding that such person be arrested; or
>
> (b) He has reasonable grounds to believe that a warrant for the person's arrest has been issued in this State or in another jurisdiction; or
>
> (c) He has reasonable grounds to believe that the person is committing or has committed an offense."

Like the United States Supreme Court, this court has long recognized the validity of warrantless arrests based on probable cause. See, *e.g.*, *Grant*, 2013 IL 112734, ¶ 11; *People v. Jackson*, 232 Ill. 2d 246, 274-75 (2009); *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986); *People v. Jones*, 16 Ill. 2d 569, 573 (1959); *People v. Tillman*, 1 Ill. 2d 525, 530 (1953); *People v. Henneman*, 373 Ill. 603, 606 (1940); *People v. Swift*, 319 Ill. 359, 363 (1925).

¶ 37    Despite this authority, defendant argues that his arrest was unlawful because the Chicago Police Department had issued an investigative alert in his case. Defendant makes two somewhat distinct arguments about investigative alerts. His first argument focuses on the structure of the investigative alert system and argues that it establishes a parallel internal proxy warrant system that is unconstitutional because it fails to comply with necessary warrant procedures such as the requirement of an affidavit presented to a neutral and detached magistrate. Defendant argues that the Chicago Police Department's internal proxy warrant system puts arresting officers in situations where they do not have sufficient assurances that they are acting on trustworthy information.

¶ 38    As noted, defendant did not raise this issue in the circuit court and therefore forfeited it for purposes of review. More importantly, however, defendant failed to introduce evidence in the circuit court about the structure of the Chicago Police Department's investigative alert system, so a record does not exist on this issue. Defendant's argument in his brief is based on references to directives found on the Chicago Police Department's website, on testimony in another case, and not on evidence in the record here. See *People v. Gipson*, 29 Ill. 2d 336, 342 (1963) (court will not consider argument relying on document not of record); *People v. Neukom*, 16 Ill. 2d 340, 346 (1959) ("we cannot pass upon matters not appearing in the record before us"); see, *e.g.*, *Freedman v. Muller*, 2015 IL App (1st) 141410, ¶ 21 (refusing to consider documents provided only in the appendix to a brief because "a court of review must determine the issues before it solely on the basis of the record made in the trial court"). We are unable to review this issue because it is not sufficiently presented by the record.

¶ 39    Defendant's second argument about investigative alerts is based on an analysis first used by the appellate court in *Bass*, 2019 IL 160640, *aff'd in part & vacated in part*, 2021 IL 125434.[3] In *Bass*, the victim told the police that she had been sexually assaulted by Bass, and the police issued an investigative alert for him. *Id.* ¶ 7. The investigative alert summarized the incident and stated that there was probable cause to arrest Bass. *Id.* Three weeks later, Bass was a passenger in a vehicle that was pulled over by the police. *Id.* ¶ 8. When the police ran a " 'name

---

[3]Although this portion of *Bass* was vacated by this court when it affirmed the appellate court's decision on another ground, we discuss it at some length because it formed the basis for defendant's argument.

check' " on Bass, they discovered the investigative alert and placed him under arrest. *Id.* The circuit court denied Bass's motion to quash arrest and suppress evidence. *Id.* ¶ 14.

¶ 40 The appellate court reversed. *Id.* ¶ 97. The court acknowledged that Bass's arrest pursuant to an investigative alert did not violate the fourth amendment, as it is well settled that the police may make warrantless arrests outside the home as long as they have probable cause for the arrest. *Id.* ¶ 37. Because Bass conceded that probable cause existed for his arrest, that arrest did not violate the fourth amendment. *Id.*

¶ 41 The appellate court in *Bass* determined, nevertheless, that the arrest violated article I, section 6, of the Illinois Constitution. *Id.* ¶ 43. The appellate court acknowledged that this court had adopted the "limited lockstep" approach for construing our constitution *vis-à-vis* the United States Constitution. *Id.* ¶ 40.[4] The appellate court held that departure from lockstep construction was warranted because of a difference in wording between the fourth amendment and the search and seizure clause of our state constitution. The fourth amendment provides that no warrants shall issue "but upon probable cause, supported by *Oath or affirmation*" (emphasis added) (U.S. Const., amend. IV), while article I, section 6, of the Illinois Constitution provides that no warrant shall issue but upon probable cause "supported by *affidavit*" (emphasis added) (Ill. Const. 1970, art. I, § 6). The court explained that the requirement of an "affidavit" rather than an "Oath or affirmation" dated from the 1870 Constitution and indicated that the search and seizure clause of our constitution was intended to provide greater protection than the fourth amendment. *Bass*, 2019 IL 160640, ¶¶ 49-57. The appellate court cited *Lippman v. People*, 175 Ill. 101, 112 (1898), for the proposition that the requirement of an "affidavit" shows that the search and seizure clause of the state constitution goes

---

[4]Under this approach, we construe provisions of our state constitution in lockstep with their federal counterparts unless certain criteria are met. In order to depart from lockstep,

" 'We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " *People v. Caballes*, 221 Ill. 2d 282, 310 (2006) (quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)).

This court has also recognized that it may depart from lockstep construction based on long-standing state traditions and values. *Id.* at 310-11.

" 'a step beyond' " the fourth amendment. *Bass*, 2019 IL App (1st) 160640, ¶ 52 (quoting *Lippman*, 175 Ill. at 112).

¶ 42 The appellate court then discussed *People v. McGurn*, 341 Ill. 632 (1930), a case in which two police officers arrested the defendant pursuant to a "standing order" from a superior officer to arrest the defendant. *Bass*, 2019 IL 160640, ¶ 55. In that case, this court invalidated the arrest, explaining that

> "under the constitution of this [s]tate no municipality has authority to clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law and thus render the liberty of every one of its citizenry subject to the arbitrary whim of such officer." *McGurn*, 341 Ill. at 638.

The *Bass* majority found in this court's case law a thread that "the mere word of an executive branch official fails, on its own, as a substantiate for a finding of probable cause." *Bass*, 2019 IL App (1st) 160640, ¶ 57. Rather, in Illinois, the "interposition of a neutral magistrate became the paradigm of investigative propriety." *Id.*

¶ 43 The appellate court in *Bass* acknowledged the long-standing common-law rule allowing warrantless felony arrests based on probable cause. *Id.* ¶ 58. Nevertheless, the court believed that *McGurn* had placed limits on this rule that were "relevant to the constitutionality of investigative alerts." *Id.* ¶ 59. The court concluded that this court's case law established the proposition that "[t]he mere word of another officer, based on the mere word of another citizen, does not meet the Illinois constitutional threshold for effectuating a lawful arrest." *Id.*

¶ 44 The appellate court in *Bass* explained, however, that the rule it was adopting would not impede officers from relying on the collective knowledge of their fellow officers. The court agreed with the State that it had clearly been established in cases such as *Whiteley v. Warden*, 401 U.S. 560 (1971), and *United States v. Hensley*, 469 U.S. 221 (1985), that arresting officers may rely on information provided by nonarresting officers, as long as the facts known to the nonarresting officers establish probable cause. *Bass*, 2019 IL App (1st) 160640, ¶ 60. However, the *Bass* majority determined that this rule applies "in a world without investigative alerts." *Id.* ¶ 62.

¶ 45    Justice Mason concurred in part and dissented in part. *Id.* ¶¶ 108-28 (Mason, J., concurring in part and dissenting in part). Justice Mason rejected the majority's determination that Bass's arrest, which was supported by probable cause, was nevertheless rendered unconstitutional because an investigative alert had been issued. *Id.* ¶ 120. Justice Mason reasoned that "there is no apparent reason why, when police have probable cause to arrest an individual (as they did here), the use of an investigative alert gives them any untoward advantage," and she pointed out that the majority had not articulated any such reason. *Id.* Justice Mason noted that Illinois law permits warrantless arrests based on probable cause (see 725 ILCS 5/107-2(1)(c) (West 2014)) and this court's case law permits the police to rely on their collective knowledge in establishing probable cause (see *People v. Buss*, 187 Ill. 2d 144, 204 (1999)). *Bass*, 2019 IL App (1st) 160640, ¶ 120. Thus, she could

> "perceive no principled basis on which to hold that police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution." *Id.*

¶ 46    As noted, this court would ultimately vacate the portion of *Bass* dealing with the constitutionality of investigative alerts. This court agreed with the appellate court's alternative basis for holding Bass's arrest unconstitutional—that it followed a traffic stop that was unlawfully extended in violation of the fourth amendment—and therefore vacated the remaining portion of the appellate court's opinion. *Bass*, 2021 IL 125434, ¶ 33. In the meantime, however, the *Bass* investigative alerts analysis had already been rejected by another panel of the First District. In *Braswell*, 2019 IL App (1st) 172810, ¶ 39, the appellate court declined to follow *Bass* and expressed its agreement with the *Bass* dissent. The appellate court explained its rejection of *Bass* as follows:

> "The majority in *Bass* suggests, however, that even where a police officer has probable cause to arrest an individual, such arrest is unconstitutional if any police agency has issued an investigative alert. This creates the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that

- 16 -

same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause." *Id.*

Until recently, all subsequent First District decisions, including the appellate court in this case (2021 IL App (1st) 180523-U, ¶ 84 (majority opinion)), would follow *Braswell* rather than *Bass*. See, *e.g.*, *People v. Hardaway*, 2022 IL App (1st) 200660-U, ¶ 26; *People v. Hodrick*, 2021 IL App (1st) 182367-U, ¶ 105; *People v. Little*, 2021 IL App (1st) 181984, ¶ 63; *Simmons*, 2020 IL App (1st) 170650, ¶ 64; *Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; *Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50.

¶ 47    Even so, another panel of the First District revived the *Bass* analysis. See *People v. Smith*, 2022 IL App (1st) 190691. In that case, the defendant was arrested in connection with the beating and death of Anthony Morris. *Id.* ¶ 3. The defendant filed a motion to quash arrest and suppress evidence, arguing that the arrest was illegal because it was based on an investigative alert and the police had waited more than six months to arrest him. *Id.* ¶ 4. The trial court denied the motion because it found that the police had probable cause to arrest him. *Id.* ¶ 16. The First District concluded that the defendant had been subjected to an unconstitutional arrest, but it ultimately did not reverse his conviction because it held that the admission of the evidence derived from the unlawful arrest was harmless error. *Id.* ¶ 101.

¶ 48    In concluding that the arrest was unlawful, the appellate court largely followed the *Bass* analysis. The court noted that the defendant had not challenged his arrest under the fourth amendment, as the United States Supreme Court has held that warrantless arrests based on probable cause do not violate the fourth amendment. *Id.* ¶ 68. The appellate court then held that the search and seizure clause of the Illinois Constitution provides greater protection than the fourth amendment because it requires that a warrant be based on probable cause supported by affidavit, rather than by oath or affirmation. *Id.* ¶ 78. Like the *Bass* court, *Smith* cited *Lippman* for the proposition that the affidavit requirement goes "a step beyond" the fourth amendment. *Id.* ¶ 81 (citing *Lippman*, 175 Ill. at 112). The appellate court argued that *Lippman* recognized the importance of a magistrate in the probable cause determination when it invalidated a statute allowing a search warrant to be issued based on the written oath of a property owner before a justice of the peace or a police magistrate that he had reason to believe that another person was using the

owner's casks, barrels, kegs, bottles, or boxes. *Id.* ¶¶ 82-84. The statute was held unconstitutional because it attempted to transfer the judicial discretion from the magistrate to the party making the affidavit. *Id.* ¶ 83.

¶ 49     Like the *Bass* majority, *Smith* also placed great importance on *McGurn*. *Smith* noted that *McGurn* had rejected a warrantless arrest based on a standing order, which the *Smith* majority believed resembled an investigative alert. *Id.* ¶ 86. The *Smith* majority asserted that *McGurn* stands for the proposition that "an officer who otherwise lacked reason to suspect a crime could not make an arrest based merely on a standing order." *Id.* ¶ 89. The appellate court summed up what it believed was the state of the law under the 1870 Constitution:

> "In sum, our supreme court precedent interpreting the search and seizure clause of the 1870 Constitution emphasized that an 'affidavit' supporting probable cause should be presented to a neutral magistrate before a warrant may issue. A warrantless arrest may be justified where the arresting officer has personal knowledge giving rise to a reasonable ground for believing that the arrestee committed a crime. See [*McGurn*, 341 Ill.] at 636. However, a municipality may not 'clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law.' *Id.* at 638." *Id.* ¶ 90.

¶ 50     *Smith* then noted that the affidavit language had been retained in the 1970 Constitution and, thus, concluded that the law as summarized above remains the same to this day. *Id.* ¶¶ 92-93. The appellate court explained that, just as this court had invalidated an arrest based on a standing order in *McGurn*, it had no choice but to hold that the defendant's arrest based on an investigative alert was unlawful. *Id.* ¶ 95. The appellate court further held that, although there were some circumstances under which an arrest based on an investigative alert might be appropriate, such as when probable cause existed and there was a danger that the suspect may commit crimes in the immediate future or was a known flight risk, those circumstances were not present there, where the police waited six months to arrest the defendant. *Id.* ¶ 97. The court acknowledged that probable cause existed for the defendant's arrest but held this to be irrelevant, as the police did not submit an affidavit to a magistrate. *Id.* ¶ 98.

¶ 51    Justice Coghlan specially concurred. *Id.* ¶¶ 114-21 (Coghlan, J., concurring). Justice Coghlan agreed with the majority that overwhelming evidence supported the defendant's guilt and that, therefore, the conviction should be affirmed. *Id.* ¶ 115. She disagreed, however, that defendant's arrest was unconstitutional. *Id.* ¶ 116. Justice Coghlan would have held that the defendant's arrest was not unconstitutional, as it was supported by probable cause. *Id.* ¶ 117. While the arresting officer did not have personal knowledge of the facts underlying the murder investigation, probable cause may be established by the collective knowledge of officers investigating a crime. *Id.*

¶ 52    Before explaining why we reject the *Bass*/*Smith* analysis, we note that *Braswell* and other cases that followed *Braswell* described the *Bass* holding too narrowly. Again, *Braswell* said that *Bass* created

> "the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause." *Braswell*, 2019 IL App (1st) 172810, ¶ 39.

But the *Bass* majority was clear that it regarded the lack of a warrant—rather than the issuance of an investigative alert—as the essential problem. The court explained that it was "beyond dispute that a finding of probable cause must be based, not only on a minimum threshold of sufficient facts, but sufficient facts presented in proper form (a sworn affidavit) to the appropriate person (a neutral magistrate)." *Bass*, 2019 IL App (1st) 160640, ¶ 62 (majority opinion). Thus, the court held that "the Illinois Constitution requires, *in the ordinary case*, a warrant to issue before an arrest can be made." (Emphasis added.) *Id.*

¶ 53    And, if there were any doubt about the court's holding, *Bass* went on to say that officers may still act without a warrant when "they are confronted with 'the need to render emergency assistance, the "hot pursuit of a fleeing suspect," and the need to prevent the imminent destruction of evidence.' " *Id.* ¶ 67 (quoting *People v. Harrison*, 2016 IL App (5th) 150048, ¶ 17, quoting *King*, 563 U.S. at 460). None of these exceptions applied to Bass's case. Thus, the court said at the end of its discussion, "[w]e find that our constitution goes 'a step beyond' the United States Constitution and requires, in ordinary cases like Bass's, that a warrant issue before

a valid arrest can be made." *Id.* ¶ 71. Clearly, despite what *Braswell* stated, *Bass* would have held the defendant's warrantless arrest to be unlawful even if an investigative alert had not been issued. *Smith*, likewise, focused on the lack of exigent circumstances and explained that the arrest was invalid, despite the presence of probable cause, because the police had not submitted an affidavit to a magistrate. *Smith*, 2022 IL App (1st) 190691, ¶¶ 96-98.

¶ 54    *Bass* and *Smith* reflect a comprehensive rejection of the position the United States Supreme Court adopted in *Watson*. Again, *Watson* held that the United States Constitution does not require arrest warrants in cases where probable cause exists, and the Supreme Court explained that it was not going to "encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like." *Watson*, 423 U.S. at 423-24. By contrast, *Bass* and *Smith* held that the Illinois Constitution *does* require arrest warrants even when probable cause exists, and *Bass* and *Smith would* require criminal prosecutions in Illinois to be encumbered with litigation with respect to exigent circumstances, etc.

¶ 55    Having clarified the holdings in *Bass* and *Smith*, we now explain why we reject them. First, the premise that the difference between the fourth amendment's use of "Oath or affirmation" and the Illinois Constitution's use of "affidavit" is a reason to depart from lockstep construction was specifically rejected in *People v. Caballes*, 221 Ill. 2d 282 (2006). Indeed, *Caballes* viewed the similarity between the wording of the fourth amendment and the search and seizure clause of the Illinois Constitution as a reason *not* to depart from lockstep:

> "The phrase 'supported by affidavit' in the state provision being virtually synonymous with 'by Oath or affirmation' in the fourth amendment, this court repeatedly held that the two constitutions should be construed alike. See *People v. Castree*, 311 Ill. 392, 395 (1924) ('The fourth amendment to the Federal constitution is in practically the same words'); *People v. Reynolds*, 350 Ill. 11, 16 (1932) (noting that the fourth amendment was 'the prototype for section 6 of article 2 of our State constitution and no reason is perceived why the latter should not receive the same interpretation as the former'); *People v. Grod*, 385 Ill. 584, 592 (1944) (the guarantees of the fourth and fifth amendments 'are in effect the same as sections 6 and 10 of article II of the Illinois constitution, and

are construed alike'); *People v. Tillman*, 1 Ill. 2d 525, 529 (1953) ('while in somewhat different language,' the two provisions are 'in effect the same' and should be construed alike); *People v. Jackson*, 22 Ill. 2d 382, 387 (1961) (restating intention to 'follow the decisions of the United States Supreme Court on identical State and Federal constitutional problems')." *Caballes*, 221 Ill. 2d at 291-92.

See also *People v. Smith*, 152 Ill. 2d 229, 250 (1992) ("This court has determined that the protections afforded by article I, section 6, of our State constitution against 'unreasonable' searches and seizures are substantially identical to those provided by the fourth amendment.").

¶ 56    Second, as the State points out, the difference between the wording of the two provisions goes only to the mechanism for obtaining a warrant and not to the scope of the warrant requirement itself. Thus, as correctly pointed out by the State, that a warrant application must be supported by affidavit does not suggest that a warrant is required for all arrests, nor does it have any bearing on the question before the court. We are concerned here with the propriety of a warrantless arrest supported by probable cause. Any long-standing state tradition of requiring that probable cause to obtain a warrant be based on an affidavit rather than on oath or affirmation provides no basis to depart from lockstep on the question of the propriety of warrantless arrests based on probable cause. With respect to that question, our long-standing state tradition is to *allow* warrantless arrests based on probable cause. See, *e.g.*, *People v. Bambulas*, 42 Ill. 2d 419, 422 (1969) ("a lawful arrest may be made without an arrest warrant if the officers making the arrest had probable cause to make it"); *Swift*, 319 Ill. at 363 ("[i]t is the rule in this State, and generally, that where an arrest is made by an officer who has reasonable ground for believing that the person arrested is implicated in a crime, such officer has a right to arrest without a warrant"); Ill. Rev. Stat. 1874, ch. 38, § 342 (allowing warrantless arrest when a criminal offense has been committed and the officer has "reasonable ground for believing that the person to be arrested has committed it").

¶ 57    Third, the principal cases relied on by *Bass* and *Smith* do not compel a different result. *Lippman* did state, as *Bass* and *Smith* noted, that the warrant clause of the state constitution goes "a step beyond" the fourth amendment because it requires an affidavit rather than an oath or affirmation. *Lippman*, 175 Ill. at 112. But

- 21 -

*Lippman* was not a lockstep case, and this court explained in *Caballes* that the wording was sufficiently similar that it did not compel a departure from lockstep. See *Caballes*, 221 Ill. 2d at 291-92. Indeed, the full quote from *Lippman* is that "[i]t is a step beyond the constitution of the United States, *in requiring the evidence of probable cause to be made a permanent record* in the form of an affidavit, *otherwise it is the same*." (Emphases added.) *Lippman*, 175 Ill. at 112. Thus, the difference between the two provisions is only in how the evidence supporting probable cause is recorded. It is not clear how one could conclude from this difference that warrantless arrests in Illinois are generally unconstitutional. Moreover, *Lippman* itself did not view this as a reason to depart from lockstep construction. Quite the opposite. Right after the "step beyond" comment, the court proceeded to rely on fourth amendment law and cases from states that have an "Oath or affirmation" requirement. *Id.* at 112-13. The statute at issue in *Lippman* provided:

> " 'In case the owner or owners of any cask, barrel, keg, bottle or box so marked, stamped and registered as aforesaid, shall, in person or by agent, *make oath in writing*, before any justice of the peace or police magistrate, that he has *reason to believe, and does believe*, that any manufacturer or bottler of ale, porter, lager beer, soda, mineral water or other beverage, or any other person, is using, in any manner by this act declared to be unlawful, any of the casks, barrels, kegs, bottles or boxes of such person or his principal, or that any junk dealer or dealer in casks, barrels, kegs, bottles or boxes, or any other dealer, manufacturer or bottler, has any such cask, barrel, keg, bottle or box secreted in, about or upon his, her or their premises, the said justice of the peace or police magistrate shall issue his search warrant and cause the premises designated to be searched as in other cases where search warrants are issued, as is now provided by law; and in case any such cask, barrel, keg, bottle or box, duly marked or stamped and registered as aforesaid, shall be found in, upon or about the premises so designated, the officer executing such search warrant shall thereupon arrest the person or persons named in such search warrant, and bring him, her or them before the justice of the peace or police magistrate who issued such warrant ***.' " (Emphases added.) *Lippman*, 175 Ill. at 110-11 (quoting Ill. Rev. Stat. 1874, ch. 120, § 4).

¶ 58        The court's concern was that the written oath required by the statute did not have to be based on facts but rather could be based on a mere belief. *Id.* at 112. The court looked to cases construing the fourth amendment and out-of-state cases construing statutes that had an "Oath or affirmation" requirement and noted that they required that the complaint "must set up facts and cannot rest on mere belief." *Id.* at 112-13. Either under the fourth amendment or state statutes that have an "Oath or affirmation" requirement, a mere belief is not sufficient to establish probable cause. *Id.* at 113. The problem in *Lippman* was that the statute allowed a warrant to issue based on the *belief* of the party requesting it. The court invalidated the statute on this basis. That party was not required "to state any fact or satisfy the magistrate that there is reasonable ground for his belief." *Id.* The court did *not* view the affidavit requirement as a reason to depart from fourth amendment law. The court *followed* fourth amendment law. Both in cases where the complaint was supported by an affidavit and those in which it was supported by an oath, probable cause could not be based on a mere belief. *Id.* at 112-13. Contrary to what *Bass* and *Smith* held, *Lippman* provides no basis to depart from lockstep.

¶ 59        Nor does *McGurn* support the *Bass*/*Smith* conclusion. *Bass* and *Smith* noted that *McGurn* held the defendant's arrest unlawful when he was arrested on the basis of a "standing order" issued by the commissioner of detectives. *Smith* specifically analogized the standing order to an investigative alert. See *Smith*, 2022 IL App (1st) 190691, ¶ 86. Both *Bass* and *Smith* relied on *McGurn*'s statement that "under the constitution of this State no municipality has authority to clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law." *McGurn*, 341 Ill. at 638; see *Bass*, 2019 IL App (1st) 160640, ¶ 56 (citing *McGurn*, 341 Ill. at 638); *Smith*, 2020 IL App (1st) 190691, ¶ 89 (citing *McGurn*, 341 Ill. at 638).

¶ 60        The passage that *Bass* and *Smith* relied on was made in the context of an arrest made without probable cause. See *McGurn*, 341 Ill. at 633-35. The court noted that it had long been the rule at common law that police may arrest without a warrant when they have probable cause and that such arrests were permitted by statute. *Id.* at 636 (citing Ill. Rev. Stat. 1929, ch. 38, ¶ 657 (Smith 1929)). The court also explained that "[i]t is the rule in this State where a criminal offense has, in fact, been committed, that an officer has a right to arrest without a warrant where he has reasonable ground for believing that the person to be arrested is implicated in the

crime." *Id.* The court then stated that the problem in the case before it was that " '[t]here was no felony which had, in fact, been committed for the commission of which [the arresting officer] had reasonable grounds to suspect [plaintiff in error].' " *Id.* at 637. The arrest in that case was based solely on a standing order, and there was no probable cause for the arrest. It is clear from the *McGurn* analysis that the court would have upheld the arrest had it been based on probable cause. Thus, that decision provides no support for the *Bass*/*Smith* conclusion, and *Smith* was clearly wrong to analogize the standing order in that case to an investigative alert based on probable cause.

¶ 61        Fourth, the *Bass*/*Smith* analysis is incompatible with the rule that probable cause may be established by the collective knowledge of the police. See *Buss*, 187 Ill. 2d at 204 (when officers are working in concert, probable cause may be established by information collectively received, even if that information is not specifically known to arresting officer). *Smith* ignored that principle altogether, while *Bass* acknowledged that it had been established by the United States Supreme Court in cases such as *Whiteley* and *Hensley* that "arresting officers can rely on information provided by nonarresting officers as long as the facts known to the nonarresting officers suffice to establish probable cause." *Bass*, 2019 IL App (1st) 160640, ¶ 60. *Bass*, however, stated that the principle applies "in a world without investigative alerts." *Id.* ¶ 61. We disagree. As Professor LaFave has noted:

> "*Whiteley* has been properly applied by the lower courts to a variety of situations. Clearly, the fellow officer rule is applicable to situations involving all modes of communication, including computer, radio, telephone, teletype and face-to-face contact. It governs whether the communication is from a superior or fellow officer within the department ***." 2 Wayne R. LaFave, Search and Seizure § 3.5(b), at 336-37 (6th ed. 2020).

¶ 62        When Officers Kinney and O'Neill were assigned the investigative alert on July 22, 2013, the detectives investigating the shooting had probable cause to arrest defendant, as provided by Hardaway's statements that, shortly after he heard gunshots, defendant, Barker, and Lynom entered his car and said they had committed the shooting and believed Lynom had killed someone. See *People v. Gocmen*, 2018 IL 122388, ¶ 19 ("probable cause exists when the facts known to the officer at the time are sufficient to lead a reasonably cautious person to believe that

the arrestee has committed a crime," which is "not proof beyond a reasonable doubt or even that it be more likely than not" that the person committed a crime); see also *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (constitutionality of arrest depends upon whether, at the moment arrest was made, officers had probable cause to make it); *Grant*, 2013 IL 112734, ¶ 11 (probable cause to arrest is based on what police knew "at the time of the arrest"). As noted by the appellate court, defendant did not dispute on appeal that the officers had probable cause to arrest. The fact that the information was shared with Officers Kinney and O'Neill by way of an investigative alert does not invalidate the arrest. As the Seventh Circuit has explained:

> "[The] police often act on each other's instructions. An all points bulletin or wanted flyer induces an officer to arrest someone about whom he knows nothing beyond the instruction to make an arrest. Whether the arrest is lawful depends on the information available to the police collectively; if the person issuing the radio bulletin or authorizing the wanted poster had probable cause to do so, the facts need not be present to the mind of the person making the arrest." *Gordon v. Degelmann*, 29 F.3d 295, 300 (7th Cir. 1994).

¶ 63    In sum, *Bass* and *Smith* erred in holding that arrests pursuant to investigative alerts automatically violate the Illinois Constitution. Those cases failed to identify any valid basis for departing from lockstep construction. This court has already held that the difference between "affidavit" in our search and seizure clause and "Oath or affirmation" in the fourth amendment was not a reason to depart from lockstep. See *Caballes*, 221 Ill. 2d at 291-92. Moreover, *Bass* and *Smith* did not identify any "state tradition and values as reflected by long-standing state case precedent" (*id.* at 314) that would justify a departure. Indeed, state case precedent demonstrates that this court has long recognized the validity of warrantless arrests based on probable cause. Thus, just as defendant's arrest did not violate the fourth amendment, it also did not violate the search and seizure clause of the Illinois Constitution. And once it is accepted that warrantless arrests for felonies do not violate the Illinois Constitution, there is no basis to hold that arrests pursuant to investigative alerts violate the Illinois Constitution. As Justice Mason noted, when the police already have the right to make a warrantless arrest for a felony, "there is no apparent reason why *** the use of an investigative alert gives them any

untoward advantage." *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part). *Smith* is hereby overruled.

¶ 64    Defendant also argues for the first time in his opening brief in this court that arrests pursuant to investigative alerts violate the separation of powers clause of the Illinois Constitution. See Ill. Const. 1970, art. II, § 1. Defendant failed to raise this issue in his petition for leave to appeal and acknowledges that the separation-of-powers clause "has not been previously cited in this case." It is therefore forfeited. See *People v. Williams*, 235 Ill. 2d 286, 298 (2009) (argument not raised in appellate court or petition for leave to appeal is twice forfeited). Moreover, the separation of powers argument is not properly presented by the record, as defendant never made this argument in the trial court. Accordingly, we decline to excuse defendant's forfeiture of this issue.

¶ 65    Furthermore, because we find defendant's arrest constitutional, we need not address his argument with regard to the inapplicability of the good faith exception.

¶ 66                                    Sentencing

¶ 67    Defendant argues that the circuit court improperly sentenced him without making findings pursuant to section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2016)). Defendant argues that, as a 17-year-old offender, he should have been sentenced with subsection (a)'s specific findings relative to his status as a juvenile offender. Defendant requests this court to order the circuit court to conduct a new sentencing hearing to consider these factors.

¶ 68    The State asserts that defendant forfeited his claim that the circuit court erred by not considering the sentencing factors listed in section 5-4.5-105(a) of the Code (*id.*) because he did not raise the issue at sentencing or in his motion to reconsider sentence. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Defendant counters that the issue is not forfeited because he raised the issue of his youth generally in his motion to reconsider and, alternatively, the error amounts to plain error. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (plain error exists when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error

alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence"); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) (plain errors affecting substantial rights may be noticed although not brought to the trial court's attention).

¶ 69 We agree with the State that defendant forfeited the issue by failing to raise it at sentencing or in his postsentencing motion. See *Hillier*, 237 Ill. 2d at 544; see also *People v. Jackson*, 2022 IL 127256, ¶ 15 ("This forfeiture rule also prevents criminal defendants from sitting idly by and knowingly allowing an irregular proceeding to go forward only to seek reversal due to the error when the outcome of the proceeding is not favorable."). Moreover, because we find no clear error occurred, we find no plain error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 70 Whether section 5-4.5-105(a)'s sentencing provisions (730 ILCS 5/5-4.5-105(a) (West 2016)) applied to defendant presents a question of statutory interpretation that this court reviews *de novo*. *People v. Hunter*, 2017 IL 121306, ¶ 15. "The cardinal rule in construing a statute is to ascertain and give effect to the legislative intent." *In re Jarquan B.*, 2017 IL 121483, ¶ 22. "The most reliable indicator of that intent is the plain and ordinary meaning of the statutory language itself." *Id.* "If the language of a statute is clear and unambiguous, we will give effect to the statute's plain meaning." *Id.* "[I]n determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). "[A] court presumes that the legislature did not intend to create absurd, inconvenient, or unjust results." *People v. Gutman*, 2011 IL 110338, ¶ 12.

¶ 71 When defendant was sentenced, subsection (a) provided as follows:

"On or after the effective date of this amendatory Act *** [(January 1, 2016, the effective date of Public Act 99-69)], when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing ***, shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a) (West 2016).

Defendant argues that, pursuant to the statute's plain language and this court's precedent, the initial "on or after the effective date" clause refers to the date of the sentencing hearing, not the date of the offense. Defendant asserts that the intervening phrase identifies to whom the statute applies: persons "under 18 years of age at the time of the commission of the offense." *Id.* The State counters that the circuit court's obligation to consider the sentencing factors under subsection (a) is triggered when, "[o]n or after the effective date" of that provision, "a person commits an offense." *Id.* The State argues that because defendant committed his offense in 2013, prior to subsection (a)'s January 1, 2016, effective date, the provisions did not apply to defendant's sentencing hearing.

¶ 72    We hereby hold that the version of section 5-4.5-105(a) in effect at the time of defendant's sentencing applied to defendant, even though he committed his offense prior to the section's effective date. This court has implicitly held as such in prior cases before this court. See *People v. Reyes*, 2016 IL 119271, ¶ 12 (remanding for resentencing under section 5-4.5-105(a) even though offense was committed prior to enactment of the statute); *Buffer*, 2019 IL 122327, ¶ 47 (same); see also *Hunter*, 2017 IL 121306, ¶¶ 45-56 (in holding that because subsection (b) (730 ILCS 5/5-4.5-105(b) (West 2016)), which included juvenile sentencing provisions giving court discretion not to impose otherwise mandatory firearm enhancements,[5] did not apply to defendants because they were sentenced well before the new juvenile sentencing provisions became effective, this court referenced subsection (a)'s temporal reach, yet it did not identify that temporal reach).

¶ 73    This construction is consistent with the subsection's clear purpose: to require courts sentencing juvenile offenders to consider the many differences between juvenile offenders and adults. See *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (juveniles have diminished culpability, greater prospects for reform, lack of maturity, underdeveloped senses of responsibility, vulnerabilities to negative influences and outside pressures, limited control over their environments, an inability to extricate themselves from crime-producing settings, and less-fixed traits leading to irretrievable depravity). To construe it otherwise would allow circuit courts to ignore these additional mitigating factors when sentencing some juvenile offenders solely because of the date of their offense. This construction of section 5-4.5-105(a), a sentencing amendment mitigating punishment, is also consistent with section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2016)), which entitles a defendant "to be sentenced under either the law in effect at the time the offense was committed or that in effect at the time of sentencing." *People v. Hollins*, 51 Ill. 2d 68, 71 (1972); see *Perry v. Department of Financial & Professional Regulation*, 2018 IL 122349, ¶ 41 (section 4 of the Statute on Statutes "is triggered where the legislature's intent as to temporal reach is not clear"). Accordingly, the version of section 5-4.5-105(a) in effect at the time of defendant's sentencing applied to defendant, even though he committed his offense prior to the section's effective

---

[5]As of January 1, 2024, the subsection providing this discretion is subsection (e). See Pub. Act 103-191, § 10 (eff. Jan. 1, 2024) (amending 730 ILCS 5/5-4.5-105).

date. Even so, the record reveals that the circuit court considered the relevant factors found in section 5-4.5-105(a) when it sentenced defendant.

¶ 74        Defendant argues that the circuit court failed to consider these statutory factors when sentencing him to an aggregate sentence of 32 years in prison. The State counters that the record clearly reveals that the circuit court considered the factors. The State asserts that, when defendant was sentenced, Illinois courts already recognized the relevance of the factors found in section 5-4.5-105(a): (1) a defendant's youth, with all its attendant characteristics, at the time of the offense (*People v. Holman*, 2017 IL 120655, ¶ 44, *overruled on other grounds*, *People v. Wilson*, 2023 IL 127666, ¶ 42 ("We have long held that age is not just a chronological fact but a multifaceted set of attributes that carry constitutional significance."); *People v. Miller*, 202 Ill. 2d 328, 341-42 (2002) (recognizing youth as mitigating because of juvenile defendants' relative immaturity)), as well as any cognitive or developmental disability that the defendant had (730 ILCS 5/5-5-3.1(a)(13) (West 2016) ("intellectual disability" is mitigating); *People v. Peeples*, 205 Ill. 2d 480, 545-46 (2002) (recognizing "cognitive deficits" as mitigating); *People v. Maxwell*, 173 Ill. 2d 102, 112 (1996) (recognizing "intellectual and developmental deficits" as mitigating)); (2) whether the defendant was subjected to any outside pressures that might have led him to commit the offense (730 ILCS 5/5-5-3.1(a)(5) (West 2016) (listing as mitigating factor that defendant's "criminal conduct was induced or facilitated by someone other than the defendant"); *People v. Jones*, 144 Ill. 2d 242, 275, 278 (1991) (recognizing evidence that defendant was susceptible to peer pressure as mitigating); *People v. Ruiz*, 132 Ill. 2d 1, 24, 26 (1989) (same with evidence that defendant was " 'more a follower than a leader' " and got involved in gangs due to "neighborhood pressure to join"); *People v. Adkins*, 41 Ill. 2d 297, 301 (1968) (sentencing court should consider "the stimuli which motivate [the defendant's] conduct"); (3) his family, educational, and social background, including whether he suffered parental neglect, physical abuse, or other childhood trauma (730 ILCS 5/5-3-1, 5-3-2(a)(1) (West 2016) (sentencing court must consider PSI, which must address defendant's "family situation and background"); *Adkins*, 41 Ill. 2d at 301 (sentencing court should consider defendant's "social environments" and "family"); see *People v. Towns*, 182 Ill. 2d 491, 518-19 (1998) (recognizing evidence that defendant had "troubled childhood" and suffered from "parental abuse and neglect" as mitigating)); (4) his rehabilitative potential (*People v. Wilson*, 143 Ill. 2d 236, 250 (1991) (recognizing

defendant's rehabilitative potential as mitigating); see Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.")); (5) the circumstances of the offense (730 ILCS 5/5-5-3.1(b) (West 2016) (sentencing court must consider "the nature and circumstances of the offense"); *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986) (same)); (6) the specific nature of his role in the offense (*Miller*, 202 Ill. 2d at 341 (recognizing defendant's less active or less culpable role in offense as mitigating)); (7) whether the defendant was meaningfully able to participate in his defense at trial (*People v. Sandham*, 174 Ill. 2d 379, 388-89 (1996); *People v. Johnson*, 183 Ill. 2d 176, 193-94 (1998)); (8) the extent of his prior juvenile and criminal history (730 ILCS 5/5-5-3.1(a)(7) (West 2016) (lack of "history of prior delinquency or criminal activity" is mitigating); *id.* §§ 5-3-1, 5-3-2(a)(1) (sentencing court must consider PSI, which must address defendant's "history of delinquency or criminality")); and (9) any other relevant and reliable evidence (*People v. Richardson*, 189 Ill. 2d 401, 417 (2000)).

¶ 75    At sentencing, the circuit court stated that it had considered the evidence presented at trial, which included defendant's age, the circumstances of the offense, and defendant's degree of participation and specific role in the offense, including that defendant had accompanied the shooters but had not fired a weapon. The circuit court stated that it had reviewed defendant's PSI report, which revealed information on defendant's family, home environment, educational and social background, including any history of parental neglect or childhood trauma, and juvenile history. The circuit court thus considered that defendant, at the age of 15, attempted suicide by hanging himself, underwent treatment in a two-week hospitalization for depression, and turned 17 less than two weeks prior to the shooting in this case. The PSI also revealed that defendant's mother and father ended their relationship when he was two years old, at which point he was raised primarily by his mother and grandmother, and that defendant did not graduate from elementary school and did not enroll in high school. The circuit court stated that it had considered the statutory factors in aggravation and mitigation, the financial impact of incarceration, the arguments of counsel, the victim impact statements, and defendant's statement in allocution. These sources presented defendant's age, impetuosity, level of maturity, potential for rehabilitation, circumstances of the offense, degree of participation, and remorse. In defendant's statement in allocution, defendant indicated, at 21 years of age, that he was taking responsibility

for his reckless behavior as a juvenile. Defendant's letter in allocation indicated he believed he was a reckless child who did not appreciate the risks involved with his behavior at the time of the offense and that he had matured and wanted to move away from Chicago, to attend college, and to live a productive life. He indicated that he recognized the severity of what he had done and illustrated remorse and accountability. Moreover, both at the initial sentencing hearing and when it later reduced his sentence from 46 to 32 years, the circuit court stated that it was mindful of defendant's youth at the time of the offense.

¶ 76 Accordingly, we hold that the record reveals the circuit court's consideration of the factors found in section 5-4.5-105(a) of the Code prior to sentencing defendant, and because we find no clear or obvious error, we find no plain error. " 'A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the "cold" record.' " *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010) (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). This court must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently. *Id.* at 213. Thus, we decline defendant's request to remand for resentencing.

¶ 77            CONCLUSION

¶ 78 For the foregoing reasons, we affirm the appellate court's judgment, affirming defendant's convictions and sentence in the circuit court.

¶ 79 Judgments affirmed.

¶ 80 JUSTICE NEVILLE, dissenting:

¶ 81 The majority's opinion legalizes investigative alerts and by doing so makes arrests by police, without a warrant issued by a judge, the official policy of the Chicago police. A reviewing court may take judicial notice of matters that are reliably verifiable from sources of indisputable accuracy or from another court's

decisions, like the Appellate Court, First District's, decisions. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 396 n.3 (2006) (courts may take judicial notice of proceedings in other courts). I take judicial notice of First District decisions, between 2007 and 2024, that discuss investigative alerts. Of 174 appeals, 173 involve Blacks and Latinos (see *infra* ¶ 196 (defendant Nos. 1 to 173)); 1 investigative alert involves a White person (see *infra* ¶ 196 (defendant No. 174)). The cases reveal that 99% of the warrantless arrests made by Chicago police that result in appeals involve Black and Latinx suspects. See *infra* ¶ 196 (defendant Nos. 1 to 174)). I find that the First District's decisions establish that investigative alerts are a systemic, racial policy or practice of Chicago police and that warrantless arrests are used predominantly to effectuate the arrests of Black and Latinx suspects. In light of the First District's decisions, I cannot concur in the majority's decision because it legalizes a systemic, racial policy or practice that authorizes the Chicago police to make warrantless arrests based on race. Therefore, because the First District's decisions establish that the majority's opinion will authorize systemic, racial policies or practices and will legalize warrantless arrests of Black and Latinx suspects by the Chicago police, I respectfully dissent.

¶ 82       Additionally, I dissent for the following reasons: (1) because, absent exigent circumstances, the United States and Illinois Constitutions do not permit warrantless arrests in the home but Clark, with no exigent circumstances, was arrested without a warrant in his home; (2) because the Illinois Constitution only permits warrantless arrests when there are exigent circumstances and there were no exigent circumstances in Clark's case; (3) because the Illinois Constitution only permits a judge to make probable cause determinations and to issue warrants for a suspect's arrest, but in this case the police made an extrajudicial determination about whether there was probable cause to arrest Clark and issued an investigative alert (an extrajudicial police warrant), which authorized the police to arrest Clark; (4) because the disparate impact of the use of investigative alerts demonstrates that the police ignore the constitution and treat Blacks and Latinx suspects like they have no rights the police must respect (see *Dred Scott v. Sanford*, 60 U.S. 393 (1856)) and establish that police appear to use judicial warrants when they arrest White suspects, but they arrest Black and Latinx suspects in a separate but unequal system of using investigative alerts (see *Plessy v. Ferguson*, 163 U.S. 537 (1896)); and (5) because the First District's decisions establish that investigative alerts are a policy or practice of the Chicago police where the police enforce the warrant

requirement in the constitutions differently based on whether they are arresting a White suspect or a Black or a Latinx suspect and as a consequence of this disparate treatment, the Chicago police violate the 2018 consent decree (see Consent Decree, *Illinois v. City of Chicago*, No. 17-cv-6260, at 15-16 (N.D. Ill. Jan. 31, 2019), https://www.chicago.gov/content/dam/city/depts/cpb/supp_info/ConsentDecree Complete.pdf [https://perma.cc/78H6-YRQB]), a contract made to protect Black and Latinx suspects from unconstitutional arrests.

¶ 83                              I. BACKGROUND

¶ 84        Police spoke with Cragg Hardaway shortly after a shooting incident on July 19, 2013. Police detained Hardaway overnight on July 20, 2013, and brought him to testify before a grand jury on July 21, 2013. Also on July 21, 2013, based on Hardaway's statements, police issued an investigative alert that told all officers they had probable cause to arrest Clark. Three days after the shooting, on July 22, 2013, police drove to Clark's home and arrested him. Clark filed a motion to quash the arrest and suppress any evidence obtained as a result of the arrest. Clark claimed the warrantless arrest violated his rights under the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 6).

¶ 85        At the hearing on the motion, Chicago police officer Patrick Kinney testified that on July 22, 2013, he went to Clark's home. A man answered Kinney's knock. Kinney said he had probable cause to arrest Clark. The man opened the door and pointed to a back bedroom, where Kinney could see Clark. Kinney, still on the threshold, told Clark he had "a probable cause investigative alert for his arrest." Clark said, "Okay, let me get some clothes." Kinney admitted he "did not have consent to go inside the house" but he entered the residence anyway because he did not "know what [defendant] was going to grab." The trial court denied the motion to suppress, and the appellate court affirmed, holding that warrantless arrests based on investigative alerts do not violate either the state or the federal constitution, as long as police have probable cause to arrest. 2021 IL App (1st) 180523-U, ¶¶ 80-84.

¶ 86                        II. THE MAJORITY'S ANALYSIS

¶ 87 The majority starts its analysis with a cursory dismissal of Clark's argument that police violated his constitutional rights by arresting him in his home without a warrant, finding the argument forfeited. *Supra* ¶¶ 31-33. Then, applying the lockstep doctrine adopted in *People v. Caballes*, 221 Ill. 2d 282, 288-317 (2006), the majority holds that *United States v. Watson*, 423 U.S. 411 (1976), supplies a binding interpretation of the Illinois Constitution's warrant requirement. *Supra* ¶¶ 55-63. The majority holds that, under *Watson*, police did not violate Clark's constitutional rights because they had probable cause when they arrested Clark on July 22, 2013. *Supra* ¶ 35.

¶ 88 III. ANALYSIS

¶ 89 I disagree (1) with the finding that Clark forfeited his argument that police violated his constitutional rights by arresting him in his home, (2) with the majority's conclusions that this court should follow the lockstep doctrine, and (3) with the holding that the *Watson* Court's interpretation of the fourth amendment binds this court's interpretation of article I, section 6, of the Illinois Constitution.

¶ 90 First, I would find the home arrest issue sufficiently preserved. Second, I find the State's evidence, which the trial court explicitly found credible, shows that the warrantless arrest took place in Clark's home and that the putative consent, following the arrest, did not validate the arrest. Third, I agree with the justices and commentators who reject the lockstep doctrine. Fourth, this court should reassess *Watson* and find that it misrepresents the history of the fourth amendment and misinterprets the amendment in a manner that subverts its fundamental purpose, resurrecting general warrants, under which "[p]ersons and places were not necessarily specified, seizure of papers and effects was indiscriminate, [and] everything was left to the discretion of the bearer of the warrant." Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 26 (Leonard W. Levy ed., De Capo Press 1970). Fifth, I analyze article I, section 6, of the Illinois Constitution and find that its purpose and its history support a finding that police may make warrantless arrests only when there are exigent circumstances or when they actually witness a crime. Finally, I have examined the racially disparate impact of the use of investigative alerts by Chicago

police and find that the policy and practice violate the City of Chicago's duties under the consent decree entered in federal court in 2018.

¶ 91                           A. The Warrantless Arrest of Clark in His Home
                                 Violated His Constitutional Rights

¶ 92                                        1. Forfeiture

¶ 93        The majority finds that Clark forfeited his argument that the arrest in his home violated the United States and Illinois Constitutions. The majority does not address Clark's argument that the issue of the arrest in the home falls under the constitutional issue exception to the forfeiture rule.

¶ 94        Constitutional issues that defense counsel raised at trial that the defendant could later raise in a postconviction petition are not subject to forfeiture on direct appeal. *People v. Almond*, 2015 IL 113817, ¶ 54.

> "[W]hen, as here, a defendant fails to raise a constitutional issue in a posttrial motion but the issue was raised at trial and could be raised in a postconviction petition 'the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition.' " *Id.* (quoting *People v. Cregan*, 2014 IL 113600, ¶ 18).

¶ 95        *Almond* and *Cregan* apply here. Clark argued in his motion to quash that his arrest in his home violated his constitutional right to be "secure in [his] person[ ] *** against unreasonable *** seizures." Ill. Const. 1970, art. I, § 6; U.S. Const., amend. IV. The issue is not subject to forfeiture on direct appeal. *Almond*, 2015 IL 113817, ¶ 54.

¶ 96                                     2. Standard of Review

¶ 97        The State contends we must limit our consideration of the constitutional issue to plain error review. But when this court has applied the constitutional issue exception to the forfeiture rule, it treats the constitutional issue as preserved. *Almond*, 2015 IL 113817, ¶ 54; *Cregan*, 2014 IL 113600, ¶¶ 18-23. Following

*Almond* and *Cregan*, this court should review the constitutionality of Clark's arrest under standards applicable to preserved issues.

¶ 98    Thus, under the applicable standard, this court should defer to the trial court's findings of fact on the motion to quash arrest, but the court should review *de novo* the trial court's legal conclusions. *People v. Jones*, 215 Ill. 2d 261, 268 (2005); *In re D.G.*, 144 Ill. 2d 404 (1991).

¶ 99                    3. No Exigent Circumstances Validate the Warrantless Arrest

¶ 100   Police arrested Hardaway, the State's identification witness, on July 20, 2013, the day after the shooting. Early on July 21, 2013, Hardaway made the statements that, according to the majority, gave police probable cause to arrest Clark. *Supra* ¶ 62. Two days after the shooting, police could not claim hot pursuit impelled them to arrest Clark without a warrant. See *People v. Abney*, 81 Ill. 2d 159, 170 (1980) ("a case involving a warrantless entry of a suspect's residence four hours after a robbery *** 'was not a case of hot pursuit, unless that term is to be stretched beyond all reasonable meaning' " (quoting *Dorman v. United States*, 435 F.2d 385, 393 (D.C. Cir. 1970) (*en banc*))).

¶ 101   Police then presented Hardaway to a grand jury on July 21, 2013, and also obtained an investigative alert with probable cause to arrest that same day. The State has not argued that exigent circumstances excused Clark's warrantless arrest on July 22, 2013, three days after the shooting. I would find that the police made the warrantless arrest without exigent circumstances. See *id.* at 169-70 (exigent circumstances excuse a warrantless arrest if delay to obtain a warrant would impede investigation and provide the suspect time to avoid capture).

¶ 102                          4. Police Arrested Clark in His Home

¶ 103   Clark argues that Kinney arrested him in his home without a warrant. The State argues that Kinney arrested Clark on the back porch of his aunt's apartment, in a public place outside Clark's home, or, if Kinney arrested Clark in his home, that the arrest came after Kinney obtained consent to enter the home. We review *de novo* the trial court's legal conclusions as to where and when the arrest occurred. *People*

*v. Luedemann*, 222 Ill. 2d 530, 542-44 (2006); *People v. Hill*, 2012 IL App (1st) 102028, ¶ 36 ("the fact of when an arrest occurs is a legal conclusion"); *United States v. Tovar-Valdivia*, 193 F.3d 1025, 1027 (8th Cir. 1999) ("Whether a particular seizure amounted to an arrest is a question of law that this court reviews de novo.").

¶ 104    In determining when the police placed a person under arrest, the court should consider "whether a reasonable person, innocent of any crime, would have considered himself arrested or free to leave; the intent of the officer and the understanding of the arrestee; and whether the defendant was told he was free to leave or that he was under arrest." *People v. Fair*, 159 Ill. 2d 51, 66 (1994). For juveniles, like Clark, the reasonable person standard is modified to take the juvenile's youth into account. *In re D.L.H.*, 2015 IL 117341, ¶ 51 (citing *People v. Braggs*, 209 Ill. 2d 492, 508-10 (2003)). That is, the court should consider whether a reasonable juvenile, innocent of any crime, would have considered himself arrested.

¶ 105    Kinney announced at the door to Clark's home that he came to arrest Clark. A reasonable juvenile, innocent of any crime, would have considered himself arrested. " 'An arrest requires *either* physical force *** *or*, where that is absent, *submission* to the assertion of authority.' " (Emphases in original.) *People v. Thomas*, 198 Ill. 2d 103, 112 (2001) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Under the *Fair* factors, the arrest occurred when Clark submitted to Kinney's assertion of authority by saying, "Okay." Thus, the arrest occurred while Kinney stood outside the house and announced the arrest, when Clark, inside his home, submitted to Kinney's authority.

¶ 106    Although courts have reached differing conclusions as to whether an arrest across the threshold counts as an arrest in the home, the more persuasive cases find that the fourth amendment requires a warrant for such arrests. In *United States v. Allen*, 813 F.3d 76, 78 (2d Cir. 2016), police, with ample probable cause but no warrant, went to Allen's home to arrest him. Allen answered the door when police knocked. *Id.* at 79. Police, outside the door, told Allen they would take him to the police station for processing in connection with allegations Allen committed an assault. *Id.* Allen acquiesced to the officers, and after Allen acquiesced, the officers went inside the home and saw evidence that led them to find a firearm. *Id.* Allen

filed a motion to quash the warrantless arrest and suppress the evidence found as a result of the arrest. *Id.* The district court denied the motion. *Id.* at 79-80.

¶ 107     The Court of Appeals for the Second Circuit noted that the United States Supreme Court expressly " 'refused to lock the Fourth Amendment into instances of actual physical trespass.' " *Id.* at 82 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). The *Allen* court held:

> "If the rule of *Payton*, and the fundamental Fourth Amendment protection of the home on which it is based, are to retain their vitality, the rule must turn on the location of the defendant, not the officers, at the time of the arrest. We therefore hold that irrespective of the location or conduct of the arresting officers, law enforcement may not cause a suspect to open the door of the home to effect a warrantless arrest of a suspect in his home in the absence of exigent circumstances." *Id.* at 85.

¶ 108     Several courts and commentators have agreed with the reasoning of *Allen*. "[I]t is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980); see *Sharrar v. Felsing*, 128 F.3d 810, 819-20 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209-11 (3d Cir. 2007); *United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984); *United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008); *People v. Lujano*, 176 Cal. Rptr. 3d 534, 544 (Ct. App. 2014); *Smith v. State*, 531 A.2d 302, 308-09 (Md. Ct. Spec. App. 1987); *State v. Peters*, 695 S.W.2d 140, 146-47 (Mo. Ct. App. 1985); *State v. George*, 317 N.W.2d 76, 80 (Neb. 1982); *State v. Morse*, 480 A.2d 183 (N.H. 1984); *State v. Holeman*, 693 P.2d 89, 91 (Wash. 1985) (*en banc*); Jennifer Marino, *Does Payton Apply: Absent Consent or Exigent Circumstance, Are Warrantless, In-Home Police Seizures and Arrests of Persons Seen Through an Open Door of the Home Legal?*, 2005 U. Chi. Legal F. 569 (2005); Caroline Hunt, Casenote, *Reaching Across the Threshold of the Fourth Amendment—Why Payton v. New York Should Be Interpreted Broadly*, 70 SMU L. Rev. 189 (2017).

¶ 109     Clark stood in his home when he acquiesced to Kinney's assertion of his power to arrest Clark. In accord with *Allen*, *Johnson*, and the cases and commentators who hold that the location of the person arrested determines whether the arrest constitutes an arrest in the home, I conclude that the warrantless arrest took place

in Clark's home.

¶ 110          5. The Evidence of Postarrest Consent Does
                Not Validate the Warrantless Arrest in Clark's Home

¶ 111     The majority claims that the warrantless arrest in Clark's home did not violate the fourth amendment because Kinney obtained consent to enter Clark's home. *Supra* ¶¶ 32-33. And the majority does not acknowledge that the putative consensual entry occurred only after the arrest. See *Thomas*, 198 Ill. 2d at 112 (seizure occurs when a defendant yields to an officer's assertion of authority).

¶ 112     Only voluntary consent validates a warrantless entry. *People v. Simpson*, 172 Ill. 2d 117, 143-44 (1996); *United States v. Reed*, 572 F.2d 412, 423 n.9 (2d Cir. 1978). "[A]cquiescence to a claim of lawful authority" does not constitute voluntary consent. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); see *People v. Davis*, 398 Ill. App. 3d 940, 956 (2010) ("Consent is involuntary where it is solely the result of acquiescence or submission to the assertion of lawful police authority."); *People v. Johnson*, 99 Ill. App. 3d 863, 865-66 (1981).

¶ 113     Kinney's testimony establishes that, after he announced that he had probable cause to arrest Clark, (1) the man who answered the door stepped aside, acquiescing to Kinney's authority, and (2) Clark acquiesced by saying "Okay." The alleged subsequent consent cannot validate this warrantless arrest.

¶ 114          6. The Warrantless Arrest in Clark's Home Violated the
                State and Federal Constitutions

¶ 115     Police arrested Clark in his home without a warrant and without exigent circumstances, in violation of Clark's rights under the fourth amendment to the United States Constitution (see *Payton v. New York*, 445 U.S. 573, 588-89 (1980) (except in exigent circumstances, a warrantless arrest in the home violates the fourth amendment)) and article I, section 6, of the Illinois Constitution (see *People v. Williams*, 161 Ill. 2d 1 (1994) (adopting *Payton*)). In *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971), the United States Supreme Court held that agents of the State, like the Chicago police officers here, lack authority to issue valid search or

arrest warrants. Therefore, this court should reverse Clark's convictions and remand for retrial without any evidence obtained as a result of the unconstitutional arrest.

¶ 116                    B. The Use of Investigative Alerts Violates
                     Article I, Section 6, of the Illinois Constitution

¶ 117                                 1. Lockstep

¶ 118    Clark separately argues that the warrantless arrest here violated the Illinois Constitution because no exigency or other circumstance excused the failure to obtain a warrant. The majority holds that, under *Watson*, 423 U.S. 411, the arrest did not violate the fourth amendment to the federal constitution and therefore it cannot violate the Illinois Constitution. *Supra* ¶¶ 55-63. The majority relies on *Caballes*, 221 Ill. 2d 282, where this court adopted the "limited lockstep" doctrine, holding that decisions of the United States Supreme Court interpreting the United States Constitution bind this court's interpretation of similar provisions in the Illinois Constitution, unless one of a small set of narrowly defined exceptions applies. The majority in *Caballes* discussed and rejected " 'flawed federal analysis' " (*id.* at 308 (quoting *State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1); *id.* at 312-13) as a basis for choosing not to adopt the United States Supreme Court's interpretation of the federal constitution as a binding interpretation of the Illinois Constitution.

¶ 119              a. The United States Supreme Court Has Misinterpreted
                            the United States Constitution

¶ 120    The United States Supreme Court itself has recognized that, in a significant number of cases, the United States Supreme Court has misinterpreted the United States Constitution. The Court found that it erred in its interpretation of the constitution in *Twining v. New Jersey*, 211 U.S. 78 (1908), *overruled by Malloy v. Hogan*, 378 U.S. 1, 2, 6 (1964); *Betts* v. *Brady*, 316 U.S. 455 (1942), *overruled by Gideon* v. *Wainwright*, 372 U.S. 335, 345 (1963); *Michigan v. Jackson*, 475 U.S. 625 (1986), *overruled by Montejo v. Louisiana*, 556 U.S. 778, 798 (2009); *Ohio v. Roberts*, 448 U.S. 56 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36

(2004); *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled by Ring v. Arizona*, 536 U.S. 584, 589 (2002); *Crooker v. California*, 357 U.S. 433 (1958), *overruled by Miranda v. Arizona*, 384 U.S. 436, 479 n.48 (1966); *Wolf v. Colorado*, 338 U.S. 25 (1949), *overruled by Mapp v. Ohio*, 367 U.S. 643, 653 (1961); *Gitlow v. New York*, 268 U.S. 652 (1925), *overruled by Dennis v. United States*, 341 U.S. 494, 507 (1951); *Goesaert* v. *Cleary*, 335 U.S. 464 (1948), *overruled by Craig* v. *Boren*, 429 U.S. 190, 210 n.23 (1976); *National League of Cities* v. *Usery*, 426 U.S. 833 (1976), *overruled by Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 557 (1985); *Olmstead v. United States*, 277 U.S. 438 (1928), *overruled by Katz v. United States*, 389 U.S. 347, 352-53 (1967); *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Grovey v. Townsend*, 295 U.S. 45 (1935), *overruled by Smith v. Allwright*, 321 U.S. 649, 665-66 (1944); *Swain v. Alabama*, 380 U.S. 202 (1965), *overruled by Batson v. Kentucky*, 476 U.S. 79 (1986); *Korematsu v. United States*, 323 U.S. 214 (1944), *overruled by Trump v. Hawaii*, 585 U.S. 667, 710 (2018); and *Plessy*, 163 U.S. 537, *overruled by Brown v. Board of Education of Topeka*, 347 U.S. 483, 494-95 (1954).

¶ 121     The United States Supreme Court took more than 50 years to overrule the mistaken constitutional rulings it imposed on the country in *Korematsu* and *Plessy*. The United States Supreme Court never overruled its decision in *Dred Scott*, 60 U.S. at 406—the citizens of this country relieved themselves of the error by adopting the thirteenth, fourteenth, and fifteenth amendments to the United States Constitution (U.S. Const., amends. XIII, XIV, XV). See *Jamison v. McClendon*, 476 F. Supp. 3d 386, 397-98 (S.D. Miss. 2020). This court must not inflict the United States Supreme Court's errors on the citizens of Illinois when this court has the power to independently interpret the Illinois Constitution.

¶ 122                    b. This Court Should Treat Federal Opinions Interpreting the
                         United States Constitution as Persuasive, Not
                                          Binding, Authority

¶ 123     For the reasons stated in my dissent in *People v. Sneed*, 2023 IL 127968, ¶¶ 133-68 (Neville, J., dissenting), and for the reasons stated by Justice Simon, Justice Freeman, Justice Clark, Justice Heiple, Justice Nickels, and Justice Goldenhersh in the opinions I cited in that dissent, as well as the reasons stated by the scholars cited

in that dissent, this court must recognize its responsibility as the final interpreter of the Illinois Constitution and treat United States Supreme Court decisions interpreting the United States Constitution as persuasive authority, following the United States Supreme Court when its reasoning persuades us and not following decisions that do not persuade us. See *State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015); *State v. Hempele*, 576 A.2d 793, 800 (N.J. 1990); *Parker v. Commonwealth*, 440 S.W.3d 381, 388 (Ky. 2014); William J. Brennan Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L. Rev. 535, 550-51 (1986).

¶ 124    Insofar as *Caballes* imposed limited lockstep on Illinois, requiring Illinois courts to follow United States Supreme Court decisions interpreting the constitution in most circumstances, this court should overrule *Caballes*. Accordingly, this court should regard *Watson* not as a binding interpretation of article I, section 6, but as authority the State cites for its persuasive force.

¶ 125    Once we recognize that United States Supreme Court opinions interpreting the United States Constitution provide only persuasive, not binding, authority in interpreting cognate provisions of the Illinois Constitution, we should determine whether this court should adopt the *Watson* majority's holding as our interpretation of article I, section 6.

¶ 126                    2. *Watson* Does Not Persuasively Interpret the
                    Illinois Constitution's Limitation on Arrests

¶ 127                    a. The *Watson* Majority Misrepresented Fourth
                    Amendment History

¶ 128    The *Watson* majority defended its decision as an interpretation of the intention of the original delegates who adopted the fourth amendment to the United States Constitution. *Watson*, 423 U.S. at 418-23.

¶ 129    When the United States adopted the Bill of Rights, anyone, including a peace officer, could arrest a person if a crime punishable by total forfeiture of the offender's lands or goods or death had occurred (see 4 William Blackstone, Commentaries *95) and the arrester "ha[d] reasonable cause for believing the

person arrested to have committed it." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 628 (1999) (hereinafter Davies, *Recovering*).

¶ 130    In a work of sophistry, the *Watson* majority transmogrified the extremely limited common-law authorization for warrantless arrests into an extremely general authorization for warrantless arrests for any offense now punishable by at least one year in prison—because legislatures have classified such offenses as "felonies" (see 18 U.S.C. § 1(1) (1970)), the same term used for the very different and far more limited set of crimes that justified loss of all lands or goods or imposition of the death penalty. See *Watson*, 423 U.S. at 438-40 (Marshall, J. dissenting, joined by Brennan, J.).

¶ 131    Scholars have concluded that the framers intended to restrict severely the authority of officers to make warrantless arrests. See William John Cuddihy, *The Fourth Amendment: Origins and Original Meaning*, at civ (1990) ("[u]nless some emergency was involved that precluded the use of a warrant, specific warrants were mandatory"); Lasson, *supra*, at 120; Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 396-97 & nn.443-47 (1974); Davies, *Recovering*, at 552.

¶ 132    Thus, if the *Watson* majority intended to interpret the fourth amendment to uphold the framers' understanding of the common law at the time of the amendment's adoption, the court would have held that police officers may arrest an individual without a warrant only if the officer saw the individual commit the offense or if the officer had probable cause to believe the individual committed one of the few crimes punishable by complete forfeiture of all one's lands or goods or by death. See Shima Baradaran Baughman, *The History of Misdemeanor Bail*, 98 B.U. L. Rev. 837, 845 n.61 (2018) (listing the common-law felonies at the time of the adoption of the United States Constitution); Horace L. Wilgus, *Arrest Without a Warrant*, 22 Mich. L. Rev. 541 (1924). It should be noted that the crime at issue in *Watson* would have required a warrant under the common law, as would the crime at issue here. See Davies, *Recovering*, at 630 n.220.

¶ 133    The *Watson* majority then misrepresented prior holdings (see *Watson*, 423 U.S. at 426 n.1 (Powell, J., concurring)) and reached its conclusion that "an arrest in a public place for a previously committed felony never requires a warrant, a result

certainly not fairly supported by either history or precedent." *United States v. Martinez-Fuerte*, 428 U.S. 543, 568 (1976) (Brennan, J., dissenting, joined by Marshall, J.).

¶ 134                              b. *Watson* Eviscerates the Fourth Amendment

¶ 135    The federal constitution's framers adopted the fourth amendment "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *People v. Dilworth*, 169 Ill. 2d 195, 201 (1996); see *King v. Ryan*, 153 Ill. 2d 449, 464 (1992). "The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy ***." *United States District Court*, 407 U.S. at 317; see Morgan Cloud, *Searching Through History; Searching for History*, 63 U. Chi. L. Rev. 1707 (1996).

¶ 136    "The Founding generation crafted the Fourth Amendment as a 'response to the reviled "general warrants" and "writs of assistance" of the colonial era.' " *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)). "[T]he reason the Framers feared and banned general warrants was precisely because such warrants purported to confer discretionary authority on the officers who held them." Thomas Y. Davies, *The Fictional Character of Law-and-Order Originalism: A Case Study of the Distortions and Evasions of Framing-Era Arrest Doctrine in Atwater v. Lago Vista*, 37 Wake Forest L. Rev. 239, 399 (2002) (hereinafter Davies, *Fictional Character*) (citing 2 Legal Papers of John Adams, at 140-43 (L. Kinvin Wroth & Hiller B. Zobel eds., Belknap Press 1965)).

¶ 137    *Watson* and other fourth amendment decisions "mark[ ] the continuing evisceration of Fourth Amendment protections against unreasonable searches and seizures." *Martinez-Fuerte*, 428 U.S. at 567 (1976) Brennan, J, dissenting. "[T]he assault on our basic liberties and freedoms by government itself has become a *** serious and potentially destructive social problem." *People v. Mitchell*, 165 Ill. 2d 211, 235 (1995) (Heiple, J., dissenting). "[T]he Fourth Amendment and the rest of the Bill of Rights were created to protect individuals from the government abuses of old England—abuses that have reemerged, in substantial part, because of *Watson* and *Terry*." Ryan Miller, Note, *The Enduring Value of the Past: Why History*

*Suggests the Supreme Court Reconsider* Watson*,* Terry*, and the Doctrine That Followed*, 59 Harv. C.R.-C.L. L. Rev. 465, 484 (2024).

¶ 138    Davies summarized the effect of the Supreme Court's fourth amendment decisions:

"the practical result of the discretionary arrest authority \*\*\* is that 'the liberty of every [person is placed] in the hands of every petty officer' and every petty officer is positioned to 'lord it over' the citizen. \*\*\* [The fourth amendment decisions] empower[ ] petty officers to act with the sort of unfettered, 'tyrannical' power the Framers thought they had prohibited in the Fifth and Fourth Amendments." Davies, *Fictional Character*, at 400 (quoting 2 Legal Papers of John Adams, at 142).

"The type of policing enabled by *Terry* and its progeny resembles the general warrants and writs of assistance that the Framers 'outspokenly opposed.' " Miller, *supra*, at 518 (quoting *Watson*, 423 U.S. at 429 (Powell, J., concurring)). The *Watson* decision gives police a general warrant to arrest anyone whenever police officers themselves conclude they have probable cause to believe the suspect committed a felony—*Watson* is the general warrant the constitution's framers sought to ban.

¶ 139    Wayne LaFave aptly reflected,

"given the pervasiveness of such minor offenses and the ease with which law enforcement agents may uncover them in the conduct of virtually everyone, [if such pretexts are allowed,] \*\*\* there exists [on the part of law enforcement agents] 'a power that places the liberty of every man in the hands of every petty officer,' precisely the kind of arbitrary authority which gave rise to the Fourth Amendment." 1 Wayne R. LaFave, Search and Seizure § 1.4(e), at 123 (3d ed. 1996) (quoting 2 Legal Papers of John Adams, at 142).

This court should reject the *Watson* Court's resurrection of general warrants and its subversion of the fourth amendment.

¶ 140                                    3. Article I, Section 6

¶ 141 Because this court should find that *Watson* does not provide a persuasive interpretation of article I, section 6, this court should look to other sources for construction of that section. Article I, section 6, of the Illinois Constitution of 1970 provides:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

¶ 142 We use the same general principles that apply to statutes when we interpret the constitution. *Kanerva v. Weems*, 2014 IL 115811, ¶ 36. We seek to "give effect to the common understanding of the citizens who adopted it." *Blanchard v. Berrios*, 2016 IL 120315, ¶ 16. We look first to the plain language used in its natural and popular meaning when the constitutional provision was adopted. *Rowe v. Raoul*, 2023 IL 129248, ¶ 21. If the plain language does not answer the question presented, we interpret the words " 'in light of the history and condition of the times, and the particular problem which the convention sought to address.' " *Kanerva*, 2014 IL 115811, ¶ 36 (quoting *Client Follow-Up Co. v. Hynes*, 75 Ill. 2d 208, 216 (1979)).

¶ 143            a. Article I, Section 6, Does Not Expressly Answer the
Question Before Us

¶ 144 In one sentence article I, section 6, bans unreasonable seizures; in the second sentence the section restricts the issuance of warrants. The fourth amendment has two similar, separate clauses in a single sentence. Neither constitutional provision expressly answers the question before us, namely, whether a police officer must obtain a warrant to render an arrest reasonable under each respective constitution— or, conversely, whether it is "unreasonable" to arrest a person without a warrant issued by a neutral and detached magistrate.

¶ 145 Ultimately, we must determine what limitations on police power the citizens of Illinois intended to impose when they adopted article I, section 6, of the Illinois Constitution. We make that determination by looking to the purpose and history of

the constitutional provision, by balancing the government's interest in the intrusion against the individual's interest in protection against the intrusion, and by reviewing other persuasive authority. See *id.*; see, *e.g.*, *People v. Boeckmann*, 238 Ill. 2d 1, 11-12 (2010) (in considering constitutional issues, this court may look to the decisions of sister states as persuasive authority). When looking at each of these considerations the answer becomes clear: except in exigent circumstances, an arrest made without a warrant is an unreasonable seizure under article I, section 6, of the Illinois Constitution.

¶ 146                      b. Purpose of Article I, Section 6

¶ 147    The delegates to the constitutional convention adopted article I, section 6, " 'to safeguard the privacy and security of individuals against arbitrary invasions' " by governmental officials. *People v. Colyar*, 2013 IL 111835, ¶ 31 (quoting *People v. McDonough*, 239 Ill. 2d 260, 266 (2010)). Its purpose largely matches the purpose of the fourth amendment. Article I, section 6, like the fourth amendment, addresses "standardless and unconstrained discretion [as] the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed." *Delaware v. Prouse*, 440 U.S. 648, 661 (1979).

¶ 148                      c. The History of Article I, Section 6

¶ 149    John Dvorak, the delegate to the Sixth Illinois Constitutional Convention who drafted article I, section 6, of the Illinois Constitution, explained that section 6 introduces "no new concepts" regarding search and seizure. 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1524 (statements of Delegate Dvorak). Dvorak referred to *Katz*, 389 U.S. 347, as established law. 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1525 (statements of Delegate Dvorak). The United States Supreme Court, in *Katz*, reasserted the general principle:

"Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' [citation], for the Constitution requires that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . . [Citation.] Over

and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes, [citation], and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *Katz*, 389 U.S. at 357.

¶ 150 In 1970, the prevailing interpretation of the Fourth Amendment applied the warrant requirement to nearly all searches and seizures. Silas J. Wasserstrom, *The Incredible Shrinking Fourth Amendment*, 21 Am. Crim. L. Rev. 257, 257-58 (1984); see Nadine Strossen, *The Fourth Amendment in the Balance: Accurately Setting the Scales Through the Least Intrusive Alternative Analysis*, 63 N.Y.U. L. Rev. 1173, 1193 (1988).

¶ 151 In accord with the conventional interpretation of search and seizure law, as courts understood the law in 1970, Dvorak said that under article I, section 6,

"for a governmental officer—a police officer—to obtain [an] *** arrest warrant—they have to go before a judicial officer to determine in fact that there is probable cause for the *** seizure, support that by affidavit, and describe the *** persons *** to be seized. Then, and only then, is it legal ***." 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1524 (statements of Delegate Dvorak).

¶ 152 The history of article I, section 6, supports the conclusion that the delegates who approved the inclusion of the article in the draft constitution understood it to require police to obtain a warrant before making an arrest, unless exigent circumstances or another narrow exception to the warrant requirement excused the lack of a warrant.

¶ 153                              d. Balancing Test

¶ 154 When this court has interpreted article I, section 6, in prior decisions, we have balanced the government's interest in the intrusion against the individual's interest in protection against the intrusion. "Decisions involving *** the Illinois Constitution's article I, section 6, require that we carefully balance the legitimate aims of law enforcement against the right of our citizens to be free from

unreasonable governmental intrusion." *People v. Tisler*, 103 Ill. 2d 226, 245 (1984). Like the United States Supreme Court in its application of the fourth amendment, we balance the competing interests on a categorical basis. *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981) (applying balancing test categorically); see *People v. Krueger*, 175 Ill. 2d 60, 75 (1996) (Illinois's test for search and seizure is like the United States Supreme Court's balancing test).

¶ 155                            i. Police Warrants—Investigative Alerts

¶ 156        Chicago Police Department (CPD) Special Order S04-16, issued December 18, 2018, shows that the CPD officially makes a practice of arresting on the basis of investigative alerts. See Chi. Police Dep't, *Investigative Alerts*, Special Order S04-16 (eff. Dec. 18, 2018), https://directives.chicagopolice.org/#directive/public/6332 [https://perma.cc/NJ3T-TDYM]; *People v. Smith*, 2022 IL App (1st) 190691, ¶ 12 (Chicago police officer testified that he did not try to obtain an arrest warrant because " 'it is not common practice' "). Accordingly, this court should apply the balancing test to the practice of arresting individuals on the basis of investigative alerts, without seeking approval of a neutral magistrate prior to the arrest. The court should determine "whether the needs of citizens for privacy *** may not be better protected by requiring a warrant before" the arrest. *United States District Court*, 407 U.S. at 315.

¶ 157                            ii. Exigent Circumstances Exception

¶ 158        The State argues that requiring warrants, except in exigent circumstances, will substantially undermine the State's ability to enforce the law. The State and *amici* do not address the effect of Illinois laws permitting police officers to obtain judicial warrants quickly. The Code of Criminal Procedure of 1963 provides:

> "The arrest warrant or summons may be issued electronically or electromagnetically by use of electronic mail or a facsimile transmission machine and any such arrest warrant or summons shall have the same validity as a written arrest warrant or summons." 725 ILCS 5/107-9(h) (West 2022).

¶ 159    The State and *amici* do not contend that the process for obtaining investigative alerts takes less time than the process for obtaining warrants electronically as permitted by section 107-9(h). Courts have responded quickly to electronic requests for warrants. See Tracy Hresko Pearl, *On Warrants & Waiting: Electronic Warrants & the Fourth Amendment*, 99 Ind. L.J. 1, 2-3 (2023). "It can take up to a full day for a supervisor to approve the request for an investigative alert." *People v. Bass*, 2019 IL App (1st) 160640, ¶ 68, *aff'd in part & vacated in part*, 2021 IL 125434. I do not see any timing benefit, or any other clear benefit (*supra* ¶ 54), to the people of Illinois from the practice of using investigative alerts, issued by police officers, instead of arrest warrants issued by courts, when police effectuate arrests.

¶ 160                          iii. Benefits of Judicial Warrants

¶ 161    I find that the people of Illinois would benefit from a general practice of requiring judicially approved warrants for arrests. See *Johnson v. United States*, 333 U.S. 10, 14-15 (1948). The United States Supreme Court's explanation of the fourth amendment also explains Illinois's constitutional warrant requirement:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. *** When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Id.* at 13-14.

¶ 162                          e. Postarrest Judicial Review Does Not
                          Sufficiently Protect Citizens' Constitutional Rights

¶ 163    The State contends citizens do not need the protection afforded by judicial approval of an arrest warrant prior to the arrest as long as judges can review the evidence after the arrest to determine whether police acted reasonably. In *Katz*, the case Representative Dvorak cited as authority on search and seizure law, the United States Supreme Court forcefully and persuasively rejected the argument now advanced by the State:

> "[The Government] argues that \*\*\* [it] should be exempted from the usual requirement of advance authorization by a magistrate upon a showing of probable cause. We cannot agree. Omission of such authorization
>
> > bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the . . . [seizure], too likely to be subtly influenced by the familiar shortcomings of hindsight judgment. [Citation.]
>
> And bypassing a neutral predetermination of the scope of a [seizure] leaves individuals secure from Fourth Amendment violations only in the discretion of the police." (Internal quotation marks omitted.) *Katz*, 389 U.S. at 358-59.

> See William J. Stuntz, *Warrants and Fourth Amendment Remedies*, 77 Va. L. Rev. 881, 912-13 (1991) (noting the problem of *ex post* bias in suppression rulings).

¶ 164    Thus, the use of warrants issued by neutral magistrates for all arrests in nonexigent circumstances provides important protections, against overreaching by police officers, for the individual's constitutional rights to security and privacy. "[P]rosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations \*\*\*." *Coolidge*, 403 U.S. at 450. The people of Illinois suffer a significant detriment from the lack of judicial supervision prior to arrests in nonexigent circumstances. The State has shown no significant advantage the people of Illinois gain from the use of investigative alerts to counter that detriment. Balancing the government's interest in the investigative alert procedure against the people's interest in security and their right to privacy, I find no justification for the use of investigative alerts as a basis for arrest.

¶ 165                      **f. Persuasive Authority Supports a Warrant Requirement for Arrests in Nonexigent Circumstances**

¶ 166       The United States Supreme Court, in many persuasive cases before *Watson*, repeated the basic constitutional requirement that, except in exigent circumstances, police must obtain a judicial warrant before making any arrest. See, *e.g.*, *McDonald v. United States*, 335 U.S. 451, 456 (1948); *Coolidge*, 403 U.S. at 450.

¶ 167       Some courts have rejected *Watson* and found that state constitutions required warrants for arrests unless exigencies excused the lack of a warrant. The Supreme Court of New Mexico, interpreting constitutional language similar to the language of the Illinois Constitution, found that the *Watson* majority did not control the New Mexico court's interpretation of the New Mexico Constitution. The court held:

> "[F]or a warrantless arrest to be reasonable the arresting officer must show that the officer had probable cause to believe that the person arrested had committed or was about to commit a felony and some exigency existed that precluded the officer from securing a warrant." *Campos v. State*, 1994-NMSC-012, ¶ 14, 117 N.M. 155, 870 P.2d 117.

See *State v. Short*, 851 N.W.2d 474, 502 (Iowa 2014) ("By involving a neutral magistrate, the warrant requirement ensures that probable cause is evaluated not by overzealous law enforcement officers."); *State v. Elison*, 2000 MT 288, ¶ 46, 302 Mont. 228, 14 P.3d 456; *People v. Avasino*, 338 N.Y.S.2d 73, 79 (Crim. Ct. 1972); *Commonwealth v. McMahon*, 2022 PA Super 133, ¶ 3; *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007).

¶ 168       Applying the persuasive reasoning of the New Mexico Supreme Court's opinion in *Campos*, along with the decisions of the courts of Iowa, Montana, New York, Pennsylvania, and Tennessee, and adopting the words of Delegate Dvorak, this court should hold that the Illinois Constitution requires police to obtain a warrant for any arrest unless police can show that exigent circumstances— insufficient time to obtain a judicial warrant—excused the failure to obtain a warrant.

¶ 169                    g. No Long-Standing State Tradition Permits Warrantless
                                Arrests in Nonexigent Circumstances

¶ 170          The majority cites five cases decided before 1970 for its assertion that "long-standing state tradition is to *allow* warrantless arrests based on probable cause." (Emphasis in original.) *Supra* ¶ 56. The majority implies that the cases support warrantless arrests even when no exigency excuses the failure to obtain a warrant. One of the cited cases, *People v. Henneman*, 373 Ill. 603, 606 (1940), held that police lacked probable cause to arrest the defendant and did not discuss exigency. Three of the other cases fall under the general rule restated in *People v. Mahaffey*, 166 Ill. 2d 1, 25 (1995). In that case an informant gave police "detailed information regarding the offenses and the offenders, and, prior to the defendant's arrest, the officers were able to verify a number of facts related to them by the informant. In addition, there was the likelihood that the defendant would flee if he were not apprehended quickly." *Id.* The *Mahaffey* court held that exigent circumstances excused the failure to obtain a warrant. *Id.* The majority's cited cases, *People v. Jones*, 16 Ill. 2d 569, 572-74 (1959), *People v. Tillman*, 1 Ill. 2d 525, 530-31 (1953), and *People v. Bambulas*, 42 Ill. 2d 419, 421-22 (1969), all exemplify the general rule: if a source gives police reason to further investigate and in the course of investigation the police obtain probable cause to arrest the suspect, exigent circumstances may excuse the failure to obtain a warrant.

¶ 171          The majority also cites three cases decided after *Watson* had completely altered the landscape of fourth amendment analysis, *People v. Grant*, 2013 IL 112734, ¶ 11, *People v. Jackson*, 232 Ill. 2d 246, 274-75 (2009), and *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). Those cases do not show an Illinois tradition unaffected by the *Watson* Court's errors.

¶ 172          The statement of facts in the majority's final case, *People v. Swift*, 319 Ill. 359, 363 (1925), does not expressly show exigency. Notably, the drafters of the Illinois Constitution of 1970 did not refer to *Swift* (or any of the other cases the majority cites) in the discussion of article I, section 6. The sponsor of the amendment expressly relied on *Katz*, 389 U.S. at 357, the case in which the United States Supreme Court persuasively held "the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police' " (quoting *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963)).

The majority has not shown that a long-standing Illinois tradition justifies removal of the requirement that, except in exigent circumstances, police must obtain a warrant issued by an impartial judicial officer before making an arrest.

¶ 173

### 4. Section 107-2(1) Does Not Support
### Warrantless Arrests

¶ 174 The majority also claims that section 107-2(1) of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-2(1) (West 2022)) supports application of the *Watson* Court's interpretation of the fourth amendment to the Illinois Constitution. *Supra* ¶ 36. This court interpreted section 107-2 in 1980, when it provided, "A peace officer may arrest a person when *** [h]e has reasonable grounds to believe that the person is committing or has committed an offense" (Ill. Rev. Stat. 1977, ch. 38, § 107-2(c)). See *Abney*, 81 Ill. 2d at 167-68. This court held that, to uphold the constitutionality of the statute, "the principles of the exigent-circumstances rule *** have been judicially engrafted upon the statute. The statute, as construed, is thus in compliance with the constitutional guidelines." *Id.* at 168.

¶ 175 Section 107-2 does not support applying the *Watson* Court's interpretation of the fourth amendment to the Illinois Constitution. Section 107-2, in accord with article I, section 6, of the Illinois Constitution, requires police to obtain a warrant for any arrest, except in exigent circumstances. *Id.*

¶ 176 The Illinois Constitution establishes the warrant requirement as a basic protection against the abuse of police power. The warrantless arrest of Clark in nonexigent circumstances violated his rights under article I, section 6, of the Illinois Constitution. Because police made a warrantless arrest based on an investigative alert, when no exigency excused the failure to obtain a judicial warrant, this court should reverse the appellate court's judgment and remand the case to the circuit court for a trial without the evidence obtained as a result of the unconstitutional warrantless arrest.

¶ 177

### 5. The Majority's Decision Approves a
### Racially Discriminatory Practice

¶ 178   Under the majority's ruling, police have unfettered discretion to decide whether they have probable cause to arrest anyone. This court should recognize the practical effect of such unfettered discretion. As one scholar wrote, "The dirty little secret of policing is that the Supreme Court has actually granted the police license to discriminate." Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* 130 (rev. ed. 2011). People of color, especially Blacks, feel the pain of the boundless discretion granted to the police when deciding whom to arrest on an investigative alert. Recently, in large part due to the availability of video evidence, the wider public has become aware of, or at least no longer able to ignore, the disparate treatment between Whites, Blacks, and Latinx individuals by the CPD. In the wake of the Chicago police shooting of Laquan McDonald, both the City of Chicago and the Department of Justice undertook investigations into CPD policies and practices.

¶ 179   CPD's own data spotlighted the disparate treatment. Of the 250,000 traffic stops in the summer of 2014 not leading to an arrest, 72% of those stopped were Black, compared to 17% Latinx and 9% White. Police Accountability Task Force, Executive Summary, *Recommendations for Reform: Restoring Trust Between the Chicago Police and the Communities They Serve* 10 (2016), https://www.chicago patf.org/wp-content/uploads/2016/04/PATF_Final_Report_Executive_Summary_ 4_13_16-1.pdf [https://perma.cc/42ER-JP3Q] (hereinafter Executive Summary). In predominantly White neighborhoods, Blacks fared even worse. Police Accountability Task Force, Report, *Recommendations for Reform: Restoring Trust Between the Chicago Police and the Communities They Serve* 37 (2016), https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_ 16-1.pdf [https://perma.cc/YAX3-PCLL] (hereinafter Report). In District 18, Blacks accounted for 57.7% of all stops even though Blacks made up only 9.1% of the population. *Id.* In District 19, Blacks accounted for 51.1% of all stops even though Blacks made up only 6.6% of the population. *Id.*

¶ 180   Black and Latinx drivers were searched approximately four times as often as White drivers, yet contraband was found on White drivers twice as often as Black and Latinx drivers. Executive Summary, *supra*, at 9. In a 2015 survey, nearly 70% of young Black males reported being stopped by police in the prior 12 months. *Id.* at 10. The disparate treatment in policing is seen in areas other than police stops.

From 2008 to 2013, CPD set up 84% of driving under the influence checkpoints in predominantly Black and Latinx police districts. Report, *supra*, at 40.

¶ 181        The Police Accountability Task Force, in its executive summary, found that there was "substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time." Executive Summary, *supra*, at 14. "There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself." *Id.*

¶ 182        A 2022 report by the City of Chicago Office of Inspector General, titled *Report on Race- and Ethnicity-Based Disparities in the Chicago Police Department's Use of Force*, confirms that the racially disparate treatment continues:

> "The quantitative evidence from investigatory stop and traffic stop data shows an overwhelming disparity in the rates at which Black and non-Black people were stopped by the police. The overrepresentation of Black people among those stopped by the police was consistent across traffic stops and investigatory stops, and it was persistent across every CPD District, notwithstanding differences in District crime rates and the demographic composition of District populations." Office of Inspector Gen., City of Chi., *Report on Race- and Ethnicity-Based Disparities in the Chicago Police Department's Use of Force* 31 (2022), https://www.igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf [https://perma.cc/7NLG-7PVK].

¶ 183        As discussed in the introduction to this dissent, my review of appellate court cases dealing with investigative alerts is consistent with the disparate treatment established by these statistics.

¶ 184        With these practical realities in mind, I am unwilling to legalize warrantless arrests as reasonable under the Illinois Constitution. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). And racial discrimination that is "more covert and less overt" is no less offensive to the Illinois Constitution where the results are the same for affected communities. See *Flowers v. Mississippi*, 588

U.S. 284, 296 (2019). "[R]andom and degrading stops and searches of [Black] youth tell kids that they are pariahs, that no matter how hard they study, they will remain potential suspects." (Internal quotation marks omitted.) Alexander, *supra*, at 200. The racial impacts of policing and the criminal justice system, so devastating to the Black and Latinx communities, have for too long been relegated to irrelevancy in court decisions.

¶ 185    Take, for instance, *Whren v. United States*, 517 U.S. 806 (1996), where the United States Supreme Court held that a traffic stop is reasonable under the fourth amendment even if the subjective reason for the stop was the suspect's race. As long as officers spotted any minor traffic infraction, they could effectuate a stop and search for more serious criminal activity. See *id.* at 814 ("the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent" (emphasis in original)). The Court concluded that, while "the Constitution prohibits selective enforcement of the law based on considerations such as race," "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Id.* at 813. But the equal protection clause provides little relief for communities affected by systemic racial disparities in policing. Even where a system is clearly turning out racially disparate results, a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." (Emphasis in original.) *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

¶ 186    The result of these investigative alert cases is simple. Police are given expansive discretion to stop, search, and arrest individuals of color. "Unbridled discretion inevitably creates huge racial disparities." Alexander, *supra*, at 103. By legalizing police discretion, the courthouse doors are closed to "all claims by defendants and private litigants that the criminal justice system operates in a racially discriminatory fashion." *Id.*

¶ 187    As Justice Sotomayor explained in her dissent in *Utah v. Strieff*, 579 U.S. 232, 252 (2016) (Sotomayor, J., dissenting), police have already been given an "array of instruments to probe and examine" individuals. "When we condone officers' use of these devices without adequate cause, we give them reason to target pedestrians in an arbitrary manner. We also risk treating members of our communities as second-

class citizens." *Id.*

¶ 188                        6. Arrests Based on Investigative Alerts Violate the
                                             Consent Decree

¶ 189        In 2017 the State of Illinois sued the City of Chicago in federal court, seeking
to enjoin the CPD " 'from engaging in a repeated pattern of using excessive force,
including deadly force, and other misconduct that disproportionately harms
Chicago's African American and Latino residents.' " *Illinois v. City of Chicago*,
No. 17-cv-6260, 2019 WL 398703, at *1 (N.D. Ill. Jan. 1, 2019). The parties
resolved the case in 2018, with the approval of the federal court, by entering into a
consent decree, which provided:

> "CPD will provide police services to all members of the public without bias and
> *** without reference to stereotype based on race, color, ethnicity, *** or
> criminal history.
>
>                                          * * *
>
> *** CPD will *** ensure that its policies and practices prohibit
> discrimination on the basis of *** race [or] color ***. ***
>
> *** CPD will continue to require that all CPD members interact with all
> members of the public in an unbiased, fair, and respectful manner. ***
>
> *** CPD will prohibit officers from using race, ethnicity, [or] color ***
> when making routine or spontaneous law enforcement decisions ***." Consent
> Decree, *Illinois v. City of Chicago*, No. 17-cv-6260, at 15-16 (N.D. Ill. Jan. 31,
> 2019),          https://www.chicago.gov/content/dam/city/depts/cpb/supp_info/
> ConsentDecreeComplete.pdf [https://perma.cc/78H6-YRQB].

¶ 190        The consent decree is both a contract between the parties and an order of the
court. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992); *Williams
v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) (A consent decree is both "a
voluntary settlement agreement which could be fully effective without judicial
intervention" and "a final judicial order [Citations.] Judicial approval of a
settlement agreement places the power and prestige of the court behind the

compromise struck by the parties."). Courts may exercise their contempt powers to enforce consent decrees. *Spallone v. United States*, 493 U.S. 265, 276 (1990) (" 'courts have inherent power to enforce compliance with their lawful orders through civil contempt' " (quoting *Shillitani* v. *United States*, 384 U.S. 364, 370 (1966))).

¶ 191    A pattern or practice of continuing racial discrimination in law enforcement violates the consent decree. "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School District v. United States*, 433 U.S. 299, 307-08 (1977). The police department's statistics show that police, left with unbridled discretion to arrest, exercise that discretion in racially discriminatory ways.

¶ 192    I have taken judicial notice of the 183 criminal cases in Cook County published in the Illinois Appellate Court reports or resolved by a Rule 23 order between 2007 and 2024 involving investigative alerts (see *infra* ¶ 196 (defendant Nos. 1 to 174 and Nos. 175 to 183)). In 154 of those cases, the alerts targeted Black men and women for arrest (see *infra* ¶ 196 (defendant Nos. 1 to 154)), 19 alerts named Latinx men (see *infra* ¶ 196 (defendant Nos. 155 to 173)), and 1 named a White woman (see *infra* ¶ 196 (defendant No. 174)). I could not obtain arrest photographs of the persons named for arrest in 16 cases, but in 7 of those cases, witnesses described the arrested suspect as Black (see *infra* ¶ 196 (defendant Nos. 146 to 152)). Although I believe the remaining nine cases involved arrests of Blacks (based on descriptions of the persons involved and the locations of the incidents), I do not rely on those arrests for my conclusions (see *infra* ¶ 196 (defendant Nos. 175 to 183)). The First District's decisions involving investigative alerts from 2007 until 2024 further show that the use of alerts fosters racial discrimination in arrests, and therefore, the continuing practice violates the 2018 consent decree.

¶ 193                              IV. CONCLUSION

¶ 194    In sum, the majority's blind obedience to *Watson* and its approval of warrantless arrests constructs a court-erected bridge around the constitution and confers on the police when there are no exigent circumstances (1) the judicial power to determine probable cause to arrest, (2) the judicial power to issue police warrants (investigative alerts) with no expiration date and nationwide effect, and (3) the

power to arrest without a judicial warrant. The bridge around the constitution here has the especially pernicious effect of approving the warrantless arrest of Clark, a juvenile, in his home. This court should not authorize police to discretionarily arrest individuals with no independent judicial probable cause determination. An arrest is the most damning restriction on an individual's liberty outside of imprisonment. For such a drastic infringement of the constitutional right to liberty, a judge should make the independent decision that probable cause exists to arrest.

¶ 195 Therefore, until this court holds that the only time it is reasonable for police to make a warrantless arrest is when there are exigent circumstances, communities of color in Illinois will return to the days of *Dred Scott* (Blacks and Latinx have no rights a police officer must respect) and *Plessy* (it is permissible for police officer to have separate and unequal interpretations of the warrant clause in the constitution—one for Whites and one for people of color). See *Dred Scott*, 60 U.S. 393; *Plessy*; 163 U.S. 537. I will not interpret article I, section 6, of the Illinois Constitution in a way that deprives people of color of their rights. The majority's decision will ensure an unfair and unequal application of the Illinois Constitution by the police. Accordingly, I respectfully dissent.

¶ 196                                          APPENDIX

(Most photos via Department of Corrections Internet Inmate Status,
https://idoc.illinois.gov/offender/inmatesearch.html)

<u>Black Males</u>

1. *People v. Myrick*, 2022 IL App (1st) 191775-U

2. *People v. Thornton*, 2020 IL App (1st) 170753

3. *People v. Noble*, 2020 IL App (1st) 190409-U

4. *People v. Miller*, 2021 IL App (1st) 191361-U

5. *People v. Burke*, 2021 IL App (1st) 200250-U

6. *People v. Hodrick*, 2021 IL App (1st) 182367-U

7. *People v. Chatmon*, 2021 IL App (1st) 191919-U

8. *People v. Stephenson*, 2021 IL App (1st) 200166-U

9. *People v. Braswell*, 2019 IL App (1st) 172810

10. *People v. Robertson*, 2016 IL App (1st) 141062-U

11. *People v. Moore*, 2021 IL App (1st) 170888-U

12. *People v. Lee*, 2014 IL App (1st) 113670-U

13. *People v. Fleming*, 2016 IL App (1st) 141355-U

14. *People v. Walker*, 2015 IL App (1st) 123369-U

15. *People v. Starks*, 2014 IL App (1st) 121169

16. *People v. Boyd*, 2021 IL App (1st) 182584

17. *People v. Parker*, 2021 IL App (1st) 173093-U

18. *People v. Hilliard*, 2017 IL App (1st) 142951-U

19. *People v. Wimberly*, 405 Ill. App. 3d 1204 (2011) (table) (unpublished order under Illinois Supreme Court Rule 23)

20. *People v. Hardaway*, 2022 IL App (1st) 200660-U

21. *People v. Stitts*, 2020 IL App (1st) 171723

22. *People v. Baldwin*, 2021 IL App (1st) 190363-U

23. *People v. Butler*, 2021 IL App (1st) 171400

24. *People v. Thompson*, 2021 IL App (1st) 182371-U

25. *People v. Pulliam*, 2021 IL App (1st) 200658-U

26. *People v. Brown*, 2021 IL App (1st) 182611-U

27. *People v. Clark*, 2021 IL App (1st) 180523-U

28. *People v. Little*, 2021 IL App (1st) 181984

29. *People v. Dossie*, 2021 IL App (1st) 201050-U

30. *People v. Baker*, 2021 IL App (1st) 171204-U

31. *People v. Thomas*, 2019 IL App (1st) 161749-U

32. *People v. Muhammad-Ali*, 2021 IL App (1st) 171721-U

33. *People v. Harris*, 2022 IL App (3d) 200234

34. *People v. Cross*, 2021 IL App (1st) 190374-U

35. *People v. Johnson*, 2021 IL App (1st) 171885

36. *People v. McGraw-Anderson*, 2021 IL App (1st) 182119-U

37. *People v. Brown*, 2020 IL App (1st) 173003-U

38. *People v. Scott*, 2020 IL App (1st) 180737-U

39. *People v. Clark*, 2020 IL App (1st) 182533

40. *People v. Robinson*, 2016 IL App (1st) 130484

41. *People v. Barnes*, 2018 IL App (1st) 152810-U

42. *People v. Phillips*, 2017 IL App (1st) 142553-U

43. *People v. Garner*, 2021 IL App (1st) 182532-U

44. *People v. Adams*, 2015 IL App (1st) 132364-U

45. *People v. Brown*, 2020 IL App (1st) 170980

46. *People v. Ollie*, 2020 IL App (1st) 172185-U

47. *People v. Higgs*, 2021 IL App (1st) 191620-U

48. *People v. Mohamed*, 2018 IL App (1st) 160670-U

49. *People v. Stepney*, 2020 IL App (1st) 180616-U

50. *People v. Thompson*, 2020 IL App (1st) 171265 (defendant Cedryck Davis)

51. *People v. Gunn*, 2020 IL App (1st) 170542

52. *People v. Yates*, 2021 IL App (1st) 180114-U

53. *People v. Williams*, 406 Ill. App. 3d (2011) (table) (unpublished order under Illinois Supreme Court Rule 23)

54. *People v. Silas*, 2020 IL App (1st) 191320-U

55. *People v. Thompson*, 2020 IL App (1st) 171265 (defendant Deandre Thompson)

56. *People v. Stanley*, 2016 IL App (1st) 142598-U

57. *People v. Caples*, 2020 IL App (1st) 161746-U

58. *People v. Hyland*, 2012 IL App (1st) 110966

59. *People v. Simmons*, 2020 IL App (1st) 170650

60. *People v. Bass*, 2019 IL App (1st) 160640

61. *People v. Brookins*, 2018 IL App (1st) 151431-U

62. *People v. McGee*, 2015 IL App (1st) 130367

63. *People v. Jordan*, 2015 IL App (1st) 120583-U

64. *People v. Baldwin*, 2017 IL App (1st) 142354-U

65. *People v. Sallis*, 2013 IL App (1st) 112302-U

66. *People v. Quick*, 2018 IL App (1st) 152432-U

67. *People v. Henderson*, 2017 IL App (1st) 151019-U

68. *People v. Pigram*, 2019 IL App (1st) 162209-U

69. *People v. Hubbard*, 2018 IL App (1st) 151780-U

70. *People v. Ross*, 2012 IL App (1st) 092445-U

71. *People v. Nixon*, 2017 IL App (1st) 150899-U

72. *People v. Minor*, 2014 IL App (1st) 122423-U

73. *People v. Rice*, 2019 IL App (1st) 162652-U

74. *People v. Lynch*, 2012 IL App (1st) 103296-U

75. *People v. Harris*, 2012 IL App (1st) 102509-U

76. *People v. Levi*, 2021 IL App (1st) 160510-UB

77. *People v. Buchanan*, 2015 IL App (1st) 132217-U

78. *People v. Polk*, 2013 IL App (1st) 112462-U

79. *People v. Reed*, 2018 IL App (1st) 152883-U

80. *People v. Williams*, 2018 IL App (1st) 160171-U

81. *People v. Lemon*, 2012 IL App (1st) 111150-U

82. *People v. Pernell*, 2016 IL App (1st) 133876-U

83. *People v. McCall*, 2017 IL App (1st) 142945-U

84. *People v. Sanders*, 2020 IL App (1st) 170325-U

85. *People v. Anderson*, 2015 IL App (1st) 140131-U

86. *People v. Barner*, 2015 IL 116949

87. *People v. Swift*, 2019 IL App (1st) 161106-U

88. *People v. Jackson*, 2018 IL App (1st) 153559-U

89. *People v. Lewis*, 2015 IL App (1st) 130171

90. *People v. Gibbs*, 2019 IL App (1st) 163132-U

91. *People v. Johnson*, 2017 IL App (1st) 141202-U

92. *People v. Brock*, 2015 IL App (1st) 133404

93. *People v. Peters*, 2011 IL App (1st) 092839

94. *People v. Smith*, 2018 IL App (1st) 170008-U

95. *People v. Davison*, 2019 IL App (1st) 161094

96. *People v. Beasley*, 2014 IL App (1st) 121300-U

97. *People v. Nugen*, 399 Ill. App. 3d 575 (1st Dist. 2010)

98. *People v. Wilson*, 2014 IL App (1st) 113570

99. *People v. Selvie*, 2012 IL App (1st) 102500-U

100. *People v. Tatum*, 2019 IL App (1st) 162403

101. *People v. Dunn*, No. 409 Ill. App. 1153 (2011) (table) (unpublished order under Illinois Supreme Court Rule 23)

102. *People v. Randall*, 2016 IL App (1st) 143371

103. *People v. Clark*, 2012 IL App (1st) 100066-U

104. *People v. Cotton*, 393 Ill. App. 3d 237 (1st Dist. 2009)

105. *People v. Williams*, 2020 IL App (1st) 163417

106. *People v. Lewis*, 2015 IL App (1st) 122411

107. *People v. Cox*, 377 Ill. App. 3d 690 (1st Dist. 2007)

108. *People v. Stewart*, 2020 IL App (1st) 170250-U

109. *People v. Wiley*, 2016 IL App (1st) 140137-U

110. *People v. Henderson*, 2017 IL App (1st) 142259

111. *People v. Harris*, 2020 IL App (1st) 190690-U

112. *People v. House*, 2014 IL App (1st) 102605-U

113. *People v. Lee*, 2013 IL App (1st) 111795-U

114. *People v. Johnson*, 2012 IL App (1st) 091324-U

115. *People v. Baker*, 2023 IL App (1st) 211588-U

116. *People v. Bradley*, 2023 IL App (1st) 190948-U

117. *People v. Carter*, 2023 IL App (1st) 220491-U (defendant Kelvin Carter)

118. *People v. Davis*, 2023 IL App (1st) 211469-U

119. *People v. Dorsey*, 2023 IL App (1st) 200304

120. *People v. Erwin*, 2023 IL App (1st) 200936

121. *People v. Gill*, 2023 IL App (1st) 201109-U

122. *People v. Hawkins*, 2023 IL App (1st) 220604-U

123. *People v. Jackson*, 2023 IL App (1st) 200017-U

124. *People v. Massey*, 2023 IL App (1st) 220123

125. *People v. Murphy*, 2023 IL App (1st) 221553-U

126. *People v. Randall*, 2023 IL App (1st) 220689-U

127. *People v. Spencer*, 2023 IL App (1st) 200646-U

128. *People v. Streater*, 2023 IL App (1st) 220640

129. *People v. Tyler*, 2023 IL App (1st) 181821-U

130. *People v. Ward*, 2023 IL App (1st) 190364

131. *People v. Wilson*, 2023 IL App (1st) 200702-U

132. *People v. Wimberly*, 2023 IL App (1st) 220809

133. *People v. Charles*, 2022 IL App (1st) 210247-U

134. *People v. Ivy*, 2022 IL App (1st) 191702-U

135. *People v. Joseph*, 2022 IL App (1st) 192051-U

136. *People v. McCray*, 2022 IL App (1st) 191099-U

137. *People v. Mohamed*, 2022 IL App (1st) 210189-U

138. *People v. Pierce*, 2022 IL App (1st) 201040-U

139. *People v. Rush*, 2022 IL App (1st) 200656-U

140. *People v. Smith*, 2022 IL App (1st) 190691 (defendant Aaron Smith)

141. *People v. Starks*, 2022 IL App (1st) 190587-U

142. *People v. Walker*, 2022 IL App (1st) 210508-U

143. *People v. Washington*, 2022 IL App (1st) 200638-U

144. *People v Wright*, 2022 IL App (1st) 210301-U

145. *People v. Smith*, 2021 IL App (1st) 190421 (defendant Rashawn Smith)

No Picture; Witness in Case Identified Defendant as Black

146. *People v. Carter*, 2023 IL App (1st) 200093-U (defendant Anton Carter)

147. *People v. Williams*, 2023 IL App (1st) 192463

148. *Van Buren v. City of Chicago*, 2023 IL App (1st) 220525-U

149. *In re J.A.*, 2019 IL App (1st) 181763-U (minor defendant)

150. *In re Antoine H.*, 2016 IL App (1st) 152677-U (minor defendant)

151. *People v. Thomas*, 2016 IL App (1st) 141040

152. *People v. Ferguson*, 2014 IL App (1st) 121614-U

Black Females

153. *People v. Moore*, 2019 IL App (1st) 180735-U

154. *People v. Carr-McKnight*, 2020 IL App (1st) 163245

Latinx Males

155. *People v. Garcia*, 2021 IL App (1st) 192576-U

156. *People v. Velez*, 2011 IL App (1st) 101650-U

157. *People v. Lerma*, 2021 IL App (1st) 181480

158. *People v. Perez*, 2021 IL App (1st) 181400-U

159. *People v. Cano*, 2020 IL App (1st) 182100-U

160. *People v. Bahena*, 2020 IL App (1st) 180197

161. *People v. Ruiz*, 2020 IL App (1st) 171436-U

162. *People v. Resendiz*, 2020 IL App (1st) 180821

163. *People v. Alicea*, 2013 IL App (1st) 112602

164. *People v. Sepulveda*, 2018 IL App (1st) 153626-U

165. *People v. Rodriguez*, 2020 IL App (1st) 171200-U

166. *People v. Andrade*, 2018 IL App (1st) 151651-U

167. *People v. Ascencio*, 2019 IL App (1st) 161693-U

168. *People v. Soto*, 2015 IL App (1st) 132367-U

169. *People v. Castillo*, 2014 IL App (1st) 122620-U

170. *People v. Aguilar*, 396 Ill. App. 3d 43 (1st Dist. 2009)

171. *People v. Gomez*, 2023 IL App (1st) 211019-U

172. *People v. Davila*, 2022 IL App (1st) 190882

173. *People v. Petatan*, 2015 IL App (1st) 132522-U

White Female

174. *People v. Wright*, 2013 IL App (1st) 113777-U

No Picture, No Witness Identification, Crime in Black Neighborhood

175. *People v. Holmes*, 2016 IL App (1st) 141210-U

176. *People v. Jones*, 2015 IL App (1st) 142997

177. *People v. Rankin*, 2015 IL App (1st) 133409

178. *People v. Alexander*, 2014 IL App (1st) 121794-U

179. *People v. Dennis*, 2014 IL App (1st) 112936-UB

180. *People v. Henderson*, 2014 IL App (1st) 120935-U

181. *People v. Allen*, 2012 IL App (1st) 111656-U

182. *People v. McGee*, 2012 IL App (1st) 102364-UB

183. *In re Dante W.*, 383 Ill. App. 3d 401 (1st Dist. 2008) (minor defendant)

<u>Black Males</u>

1. *People v. Myrick*, 2022 IL App (1st) 191775-U



**Y20791 - MYRICK, DAVID A.**

Parent Institution: DIXON CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DIXON CORRECTIONAL CENTER

**PHYSICAL PROFILE**
Date of Birth: 03/31/1983
Weight: 250 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

2. *People v. Thornton*, 2020 IL App (1st) 170753



**Y19115 - THORNTON, CHARLES E.**

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD
**Sex Offender Registry Required**

**PHYSICAL PROFILE**
Date of Birth: 03/13/1979
Weight: 168 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Brown

3. *People v. Noble*, 2020 IL App (1st) 190409-U



### Y34032 - NOBLE, DEONTA

| | |
|---|---|
| Parent Institution: | HILL CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | HILL |

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 05/25/1994 |
| Weight: | 153 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 09 in. |
| Race: | Black |
| Eyes: | Brown |

4. *People v. Miller*, 2021 IL App (1st) 191361-U



### M37504 - MILLER, CHARLES

| | |
|---|---|
| Parent Institution: | MENARD CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | MENARD |

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 02/21/1988 |
| Weight: | 280 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 01 in. |
| Race: | Black |
| Eyes: | Brown |

5. *People v. Burke*, 2021 IL App (1st) 200250-U

 

**N80531 - BURKE, DWAYNE**

Parent Institution: STATEVILLE CORRECTIONAL CENTER
Offender Status: PAROLE
Location: PAROLE DISTRICT 1

**PHYSICAL PROFILE**

Date of Birth: 03/26/1968
Weight: 190 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

6. *People v. Hodrick*, 2021 IL App (1st) 182367-U

 

**Y31929 - HODRICK, DOMINIQUE**

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

**PHYSICAL PROFILE**

Date of Birth: 05/28/1981
Weight: 160 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Brown

7. *People v. Chatmon*, 2021 IL App (1st) 191919-U



**M31356 - CHATMAN, VICTOR**

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

**PHYSICAL PROFILE**

Date of Birth: 01/10/1992
Weight: 199 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 05 in.
Race: Black
Eyes: Brown

8. *People v. Stephenson*, 2021 IL App (1st) 200166-U



**B74904 - STEPHENSON, ANTHONY**

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

**PHYSICAL PROFILE**

Date of Birth: 03/19/1977
Weight: 200 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 01 in.
Race: Black
Eyes: Brown

9. *People v. Braswell*, 2019 IL App (1st) 172810



**Y25777 - BRASWELL, JAMAL**

Parent Institution: DANVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DANVILLE

**PHYSICAL PROFILE**

Date of Birth: 10/20/1991
Weight: 165 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 00 in.
Race: Black
Eyes: Brown

10. *People v. Robertson*, 2016 IL App (1st) 141062-U



**R30809 - ROBERTSON, KENYADA**

Parent Institution: DANVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DANVILLE

**PHYSICAL PROFILE**

Date of Birth: 09/12/1985
Weight: 215 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

11. *People v. Moore*, 2021 IL App (1st) 170888-U



12. *People v. Lee*, 2014 IL App (1st) 113670-U



**B50137 - LEE, TERRIN**

Parent Institution:    MENARD CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    MENARD

## PHYSICAL PROFILE

Date of Birth:    12/14/1973
Weight:    272 lbs.
Hair:    Black
Sex:    Male
Height:    6 ft. 04 in.
Race:    Black
Eyes:    Brown

13. *People v. Fleming*, 2016 IL App (1st) 141355-U



## K71444 - FLEMING, RUBEN

Parent Institution:      SHERIDAN CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:

## PHYSICAL PROFILE

Date of Birth:      09/27/1977
Weight:      215 lbs.
Hair:      Black
Sex:      Male
Height:      5 ft. 10 in.
Race:      Black
Eyes:      Brown

14. *People v. Walker*, 2015 IL App (1st) 123369-U



## M32755 - WALKER, JUSTIN

Parent Institution:      PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:      PINCKNEYVILLE

## PHYSICAL PROFILE

Date of Birth:      10/15/1990
Weight:      180 lbs.
Hair:      Brown
Sex:      Male
Height:      6 ft. 04 in.
Race:      Black
Eyes:      Brown

15. *People v. Starks*, 2014 IL App (1st) 121169



## M27220 - STARKS, BRANDON

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

## PHYSICAL PROFILE

Date of Birth: 04/30/1987
Weight: 165 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 00 in.
Race: Black
Eyes: Brown

16. *People v. Boyd*, 2021 IL App (1st) 182584



## M37106 - BOYD, LAWRENCE

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

## PHYSICAL PROFILE

Date of Birth: 08/18/1989
Weight: 260 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

17. *People v. Parker*, 2021 IL App (1st) 173093-U



18. *People v. Hilliard*, 2017 IL App (1st) 142951-U




### M47043 - HILLIARD, ANDRE

**Parent Institution:** JOLIET TREATMENT CENTER
**Offender Status:** IN CUSTODY
**Location:**

### PHYSICAL PROFILE

**Date of Birth:** 12/05/1994
**Weight:** 164 lbs.
**Hair:** Black
**Sex:** Male
**Height:** 6 ft. 00 in.
**Race:** Black
**Eyes:** Brown

19. *People v. Wimberly*, 405 Ill. App. 3d 1204 (2011) (table) (unpublished order under Illinois Supreme Court Rule 23)



R50509 - WIMBERLY, DARRELL

Parent Institution:      SHERIDAN CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:

**PHYSICAL PROFILE**

Date of Birth:      11/20/1985
Weight:      185 lbs.
Hair:      Black
Sex:      Male
Height:      5 ft. 08 in.
Race:      Black
Eyes:      Brown

20. *People v. Hardaway*, 2022 IL App (1st) 200660-U



B59247 - HARDAWAY, MAURICE

Parent Institution:      MENARD CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:      MENARD

**PHYSICAL PROFILE**

Date of Birth:      01/11/1973
Weight:      249 lbs.
Hair:      Black
Sex:      Male
Height:      5 ft. 06 in.
Race:      Black
Eyes:      Brown

21. *People v. Stitts*, 2020 IL App (1st) 171723



22. *People v. Baldwin*, 2021 IL App (1st) 190363-U



R28266 - BALDWIN, DERRICK

Parent Institution: BIG MUDDY CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: BIG MUDDY RIVER

**Sex Offender Registry Required**

## PHYSICAL PROFILE

Date of Birth: 10/05/1979
Weight: 159 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 10 in.
Race: Black
Eyes: Brown

23. *People v. Butler*, 2021 IL App (1st) 171400



## M05574 - BUTLER, DONQUILA

Parent Institution:    SHAWNEE CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    SHAWNEE

**Sex Offender Registry Required**

## PHYSICAL PROFILE
Date of Birth:    03/18/1979
Weight:    219 lbs.
Hair:    Black
Sex:    Male
Height:    5 ft. 08 in.
Race:    Black
Eyes:    Brown

24. *People v. Thompson*, 2021 IL App (1st) 182371-U



Identity cross-checked using date of arrest.

25. *People v. Pulliam*, 2021 IL App (1st) 200658-U



### Y21867 - PULLIAM, DORIAN

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**Sex Offender Registry Required**

### PHYSICAL PROFILE

Date of Birth: 04/14/1980
Weight: 195 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 05 in.
Race: Black
Eyes: Brown

26. *People v. Brown*, 2021 IL App (1st) 182611-U



### R64720 - BROWN, DANIEL

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

### PHYSICAL PROFILE

Date of Birth: 02/15/1989
Weight: 176 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

27. *People v. Clark*, 2021 IL App (1st) 180523-U



## Y26608 - CLARK, ANGELO

Parent Institution:     HILL CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     HILL

### PHYSICAL PROFILE

Date of Birth:     07/10/1996
Weight:     185 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 11 in.
Race:     Black
Eyes:     Brown

28. *People v. Little*, 2021 IL App (1st) 181984



## Y31393 - LITTLE, DIAMOND

Parent Institution:     MENARD CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     MENARD

### PHYSICAL PROFILE

Date of Birth:     01/10/1994
Weight:     145 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 04 in.
Race:     Black
Eyes:     Brown

29. *People v. Dossie*, 2021 IL App (1st) 201050-U





30. *People v. Baker*, 2021 IL App (1st) 171204-U

 

**N93480 - BAKER, MARSHALL**

| | |
|---|---|
| Parent Institution: | MENARD CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | MENARD |

**Sex Offender Registry Required**

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 09/04/1961 |
| Weight: | 124 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 04 in. |
| Race: | Black |
| Eyes: | Brown |

31. *People v. Thomas*, 2019 IL App (1st) 161749-U



Y14076 - THOMAS, DJUAN

Parent Institution: ILLINOIS RIVER CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: ILLINOIS RIVER

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 06/24/1998 |
| Weight: | 175 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 06 in. |
| Race: | Black |
| Eyes: | Brown |

32. *People v. Muhammad-Ali*, 2021 IL App (1st) 171721-U



Y22039 - MUHAMMAD-ALI, SOLOMON

Parent Institution: SHAWNEE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: SHAWNEE

**Sex Offender Registry Required**

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 12/18/1981 |
| Weight: | 220 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 07 in. |
| Race: | Black |
| Eyes: | Brown |

33. *People v. Harris*, 2022 IL App (3d) 200234



R68630 - HARRIS, THOMAS M.

Parent Institution: STATEVILLE CORRECTIONAL CENTER
Offender Status: PAROLE
Location: PAROLE DISTRICT 2

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 01/19/1987 |
| Weight: | 380 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 11 in. |
| Race: | Black |
| Eyes: | Brown |

34. *People v. Cross*, 2021 IL App (1st) 190374-U



M43498 - CROSS, TAQUELL

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: PAROLE
Location: PAROLE DISTRICT 1

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 10/31/1994 |
| Weight: | 152 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 06 in. |
| Race: | Black |
| Eyes: | Brown |

35. *People v. Johnson*, 2021 IL App (1st) 171885



36. *People v. McGraw-Anderson*, 2021 IL App (1st) 182119-U



37. *People v. Brown*, 2020 IL App (1st) 173003-U



38. *People v. Scott*, 2020 IL App (1st) 180737-U



M23748 - SCOTT, ANTONIO

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location:

**PHYSICAL PROFILE**

Date of Birth: 04/16/1991
Weight: 150 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

39. *People v. Clark*, 2020 IL App (1st) 182533



CHICAGO POLICE DEPARTMENT
**ARREST REPORT**

FINAL APPROVAL
JUVENILE DISPOSITION

ARREST REPORTING

Name: CLARK, Demonte
DOB: 11 September 1996

Male
Black
6'06"
130 lbs
Brown Eyes
Black Hair
Dreadlocks Hair Style
Dark Brown Complexion

40. *People v. Robinson*, 2016 IL App (1st) 130484



### R21491 - ROBINSON, KEVIN

Parent Institution: PONTIAC CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PONTIAC

**Sex Offender Registry Required**

## PHYSICAL PROFILE

Date of Birth: 12/23/1983
Weight: 215 lbs.
Hair: Brown
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

41. *People v. Barnes*, 2018 IL App (1st) 152810-U



### M50483 - BARNES, AARON

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

## PHYSICAL PROFILE

Date of Birth: 08/02/1992
Weight: 170 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

42. *People v. Phillips*, 2017 IL App (1st) 142553-U



## M27060 - PHILLIPS, JAMES E.

Parent Institution:     TAYLORVILLE CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     TAYLORVILLE

### Sex Offender Registry Required

## PHYSICAL PROFILE
Date of Birth:     05/17/1974
Weight:     160 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 07 in.
Race:     Black
Eyes:     Brown

43. *People v. Garner*, 2021 IL App (1st) 182532-U



## Y32973 - GARNER, JABRIL

Parent Institution:     MENARD CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     MENARD

## PHYSICAL PROFILE
Date of Birth:     10/11/1993
Weight:     223 lbs.
Hair:     Black
Sex:     Male
Height:     6 ft. 01 in.
Race:     Black
Eyes:     Brown

44. *People v. Adams*, 2015 IL App (1st) 132364-U



**B03660 - ADAMS, ANTHONY**

Parent Institution:      PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:      PINCKNEYVILLE

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 09/19/1963 |
| Weight: | 165 lbs. |
| Hair: | Brown |
| Sex: | Male |
| Height: | 5 ft. 09 in. |
| Race: | Black |
| Eyes: | Hazel |

45. *People v. Brown*, 2020 IL App (1st) 170980



**M18929 - BROWN, KIAR**

Parent Institution:      PONTIAC CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:      PONTIAC

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 04/11/1991 |
| Weight: | 179 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 11 in. |
| Race: | Black |
| Eyes: | Brown |

46. *People v. Ollie*, 2020 IL App (1st) 172185-U



B45444 - OLLIE, JIMMIE

Parent Institution: DANVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DANVILLE

PHYSICAL PROFILE

Date of Birth: 09/09/1972
Weight: 282 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 02 in.
Race: Black
Eyes: Brown

47. *People v. Higgs*, 2021 IL App (1st) 191620-U



48. *People v. Mohamed*, 2018 IL App (1st) 160670-U



M19608 - MOHAMED, ELEMO

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

## PHYSICAL PROFILE

Date of Birth: 01/15/1992
Weight: 160 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

49. *People v. Stepney*, 2020 IL App (1st) 180616-U



50. *People v. Thompson*, 2020 IL App (1st) 171265 (defendant Cedryck Davis)

 

## M27481 - DAVIS, CEDRYCK

Parent Institution:     JOLIET TREATMENT CENTER
Offender Status:     IN CUSTODY
Location:

## PHYSICAL PROFILE

Date of Birth:     02/18/1991
Weight:     164 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 11 in.
Race:     Black
Eyes:     Brown

51. *People v. Gunn*, 2020 IL App (1st) 170542

 

## Y19505 - GUNN, OMAR

Parent Institution:     MENARD CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     MENARD

## PHYSICAL PROFILE

Date of Birth:     03/01/1996
Weight:     164 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 04 in.
Race:     Black
Eyes:     Brown

52. *People v. Yates*, 2021 IL App (1st) 180114-U



M01860 - YATES, ANDRE A.

Parent Institution: DIXON CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DIXON CORRECTIONAL CENTER

PHYSICAL PROFILE

Date of Birth: 06/17/1990
Weight: 189 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 06 in.
Race: Black
Eyes: Brown

53. *People v. Williams*, 406 Ill. App. 3d (2011) (table) (unpublished order under Illinois Supreme Court Rule 23)



R68853 - WILLIAMS, JESSIE

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PINCKNEYVILLE

PHYSICAL PROFILE

Date of Birth: 11/18/1983
Weight: 212 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 02 in.
Race: Black
Eyes: Brown

54. *People v. Silas*, 2020 IL App (1st) 191320-U



Identity cross-checked using publicly available arrest history and details from the order in *Silas*, 2020 IL App (1st) 191320-U. Silas was arrested on S. Trumbull Ave. on August 4, 2014, and November 2, 2016, on unrelated charges. In 2017, he was stopped for a traffic violation and subsequently arrested pursuant to an investigative alert in connection with an armed robbery at the same S. Trumbull Avenue address. At trial, the State indicated Silas resided there, that there were four other criminal complaints allegedly involving Silas, and that all five incidents occurred within the span of eight days in a hallway at that address.

55. *People v. Thompson*, 2020 IL App (1st) 171265 (defendant Deandre Thompson)



56. *People v. Stanley*, 2016 IL App (1st) 142598-U



## M46171 - STANLEY, KEVIN

Parent Institution:    MENARD CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    MENARD

## PHYSICAL PROFILE

Date of Birth:    01/04/1983
Weight:    330 lbs.
Hair:    Black
Sex:    Male
Height:    6 ft. 05 in.
Race:    Black
Eyes:    Brown

57. *People v. Caples*, 2020 IL App (1st) 161746-U



## Y13956 - CAPLES, STEPHAN

Parent Institution:    BIG MUDDY CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    BIG MUDDY RIVER

## PHYSICAL PROFILE

Date of Birth:    01/16/1991
Weight:    227 lbs.
Hair:    Black
Sex:    Male
Height:    5 ft. 06 in.
Race:    Black
Eyes:    Brown

58. *People v. Hyland*, 2012 IL App (1st) 110966



Kraig Hyland was booked in Cook County, IL
Mugshots.com : 248435
DOC Number : R07673
Parent Institution : ROBINSON CORRECTIONAL CENTER
Inmate Status : IN CUSTODY
Location : ROBINSON
Birth date : 7 25 1978
Weight : 212 lb (96 kg)
Hair Color : Black
Gender : Male
Height : 6' 6" (1.98 m)
Race : Black

Photo via mugshots.com. Identity cross-checked using details regarding Hyland's gang affiliation and tattoos. See *Hyland*, 2012 IL App (1st) 110966, ¶ 9 ("Officer Lara then asked defendant if he was a member of a gang and defendant said he was a '70s Babies GD.' "); *id.* ¶ 10 ("After being asked whether he had any gang tattoos, defendant showed the officers two tattoos on his stomach and left forearm. Officer Lara was also shown a photo of defendant in which he identified two teardrop tattoos below defendant's right eye.").

59. *People v. Simmons*, 2020 IL App (1st) 170650



**R12863 - SIMMONS, DONELL**

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location:

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 07/15/1981 |
| Weight: | 235 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 11 in. |
| Race: | Black |
| Eyes: | Brown |

60. *People v. Bass*, 2019 IL App (1st) 160640



Details

Arrest

| | |
|---|---|
| NAME | CORDELL T BASS |
| AGE | 27 |
| CB NUMBER | 19954269 |
| ARRESTED | Wednesday, August 13, 2014 1:41 AM |
| ARREST LOCATION | 139 W MARQUETTE RD |
| ARRESTING AGENCY | CHICAGO POLICE DEPARTMENT |
| RELEASED (AGENCY DETENTION FACILITY) | Thursday, August 14, 2014 10:35 AM |
| BOND TYPE | |
| BOND AMOUNT | |
| BOND DATE | |
| AREA | 2 - South |
| DISTRICT | 007 |
| BEAT | 0722 |

Identity cross-checked with details in the State's brief in *Bass*, 2019 IL App (1st) 160640. "Defendant was arrested following an August 2014 traffic stop, during which police ran a 'name check' and discovered an 'investigative alert with probably cause for [his] arrest.' In September 2014, defendant was charged with criminal sexual assault." "The testimony at the hearing on defendant's motion established that he was the front-seat passenger in a van that failed to stop for a red light during the early morning hours of August 13, 2014."

61. *People v. Brookins*, 2018 IL App (1st) 151431-U




B59388 - BROOKINS, LARRY E.

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: PAROLE
Location: PAROLE DISTRICT 1

PHYSICAL PROFILE
Date of Birth: 07/05/1958
Weight: 237 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

62. *People v. McGee*, 2015 IL App (1st) 130367



### K63835 - MCGEE, ANTHONY

Parent Institution:     DANVILLE CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     DANVILLE

### PHYSICAL PROFILE

Date of Birth:     05/11/1980
Weight:     170 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 07 in.
Race:     Black
Eyes:     Brown

63. *People v. Jordan*, 2015 IL App (1st) 120583-U



### B66331 - JORDAN, DONALD

Parent Institution:     PONTIAC CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     PONTIAC

**Sex Offender Registry Required**

### PHYSICAL PROFILE

Date of Birth:     05/07/1978
Weight:     275 lbs.
Hair:     Black
Sex:     Male
Height:     6 ft. 00 in.
Race:     Black
Eyes:     Brown

64. *People v. Baldwin*, 2017 IL App (1st) 142354-U



R28266 - BALDWIN, DERRICK

Parent Institution: BIG MUDDY CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: BIG MUDDY RIVER

**Sex Offender Registry Required**

**PHYSICAL PROFILE**

Date of Birth: 10/05/1979
Weight: 159 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 10 in.
Race: Black
Eyes: Brown

65. *People v. Sallis*, 2013 IL App (1st) 112302-U



K72398 - SALLIS, TIMOTHY

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**PHYSICAL PROFILE**

Date of Birth: 09/06/1963
Weight: 200 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 10 in.
Race: Black
Eyes: Brown

66. *People v. Quick*, 2018 IL App (1st) 152432-U

## Details

Arrest

| | |
|---|---|
| NAME | JEROME T QUICK |
| AGE | 49 |
| CB NUMBER | 18909793 |
| ARRESTED | Saturday, June 7, 2014 8:10 AM |
| ARREST LOCATION | 4203 S WELLS ST |
| ARRESTING AGENCY | CHICAGO POLICE DEPARTMENT |
| RELEASED (AGENCY DETENTION FACILITY) | Sunday, June 8, 2014 8:56 AM |
| BOND TYPE | |
| BOND AMOUNT | |
| BOND DATE | |
| AREA | 1 - Central |
| DISTRICT | 009 |
| BEAT | 0925 |



History

Charges

| | | |
|---|---|---|
| 720 ILCS 5.0/16-1-A-1 | THEFT/CONTROL/PERSON/<$500 | OFFENSE AS CITED |

67. *People v. Henderson*, 2017 IL App (1st) 151019-U

 

## R40853 - HENDERSON, SHAUN

Parent Institution:     LAWRENCE CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     LAWRENCE CORRECTIONAL CENTER

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 12/24/1982 |
| Weight: | 125 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 05 in. |
| Race: | Black |
| Eyes: | Brown |

- 103 -

68. *People v. Pigram*, 2019 IL App (1st) 162209-U



## M04287 - PIGRAM, FREDERICK

Parent Institution:     MENARD CORRECTIONAL CENTER
Offender Status:     IN CUSTODY
Location:     MENARD

## PHYSICAL PROFILE

Date of Birth:     09/11/1975
Weight:     172 lbs.
Hair:     Black
Sex:     Male
Height:     5 ft. 06 in.
Race:     Black
Eyes:     Brown

69. *People v. Hubbard*, 2018 IL App (1st) 151780-U

## Details

Arrest



NAME     WILLIE J HUBBARD
AGE     50
CB NUMBER     19824002

ARRESTED     Tuesday, June 11, 2019 9:27 PM
ARREST LOCATION     1614 W 63RD ST
ARRESTING AGENCY     CHICAGO POLICE DEPARTMENT
RELEASED (AGENCY DETENTION FACILITY)     Wednesday, June 12, 2019 8:00 AM

BOND TYPE
BOND AMOUNT
BOND DATE

AREA     2 - South
DISTRICT     007
BEAT     0714

History

70. *People v. Ross*, 2012 IL App (1st) 092445-U



## M07835 - ROSS, DETRIC

Parent Institution:      MENARD CORRECTIONAL CENTER
Offender Status:      IN CUSTODY
Location:      MENARD

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 10/13/1986 |
| Weight: | 208 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 00 in. |
| Race: | Black |
| Eyes: | Brown |

71. *People v. Nixon*, 2017 IL App (1st) 150899-U



## K69321 - NIXON, MARCUS

Parent Institution:      DIXON CORRECTIONAL CENTER
Offender Status:      PAROLE
Location:      PAROLE DISTRICT 1

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 07/07/1977 |
| Weight: | 165 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 11 in. |
| Race: | Black |
| Eyes: | Brown |

72. *People v. Minor*, 2014 IL App (1st) 122423-U



R52353 - MINOR, DEANDRE

Parent Institution:    PONTIAC CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:

**Sex Offender Registry Required**

## PHYSICAL PROFILE

Date of Birth:    10/10/1984
Weight:    207 lbs.
Hair:    Brown
Sex:    Male
Height:    6 ft. 00 in.
Race:    Black
Eyes:    Brown

73. *People v. Rice*, 2019 IL App (1st) 162652-U

## Details

Arrest



NAME    CLIFTON L RICE
AGE    28
CB NUMBER    18061397

ARRESTED    Sunday, February 7, 2016 3:14 PM
ARREST LOCATION    2006 S MARSHALL BLVD
ARRESTING AGENCY    CHICAGO POLICE DEPARTMENT
RELEASED (AGENCY    Tuesday, February 9, 2016 7:13 AM
DETENTION FACILITY)

BOND TYPE
BOND AMOUNT
BOND DATE

AREA    1 - Central
DISTRICT    010
BEAT    1023

History

- 106 -

74. *People v. Lynch*, 2012 IL App (1st) 103296-U



| | |
|---|---|
| Name: | LYNCH, TOMMIE L |
| Alias Name(s): | |
| Date of Birth: | 8/5/1950 |
| Alias DoB(s): | |
| Height: | 5'08"   Weight:   189 lbs.   Sex:   M   Race:   B |
| Address: | 2715 W W HARRISON ST |
| | CHICAGO, IL 60612 |

**Crime Information**

**Sexual Predator**   VICTIM WAS 13 YEARS OF AGE
OFFENDER WAS 42 AT THE TIME OF THE OFFENSE

Crimes:   FELONY CONVICTION AFTER 7/1/2011
AGGRAVATED CRIMINAL SEXUAL ABUSE/VICTIM <13
FAILURE TO REPORT CHANGE OF ADDRESS
FAILURE TO REPORT ANNUALLY/2+
FAILURE TO REPORT A CHANGE OF ADDRESS/EMPLOYMENT

County of Conviction:   Cook

75. *People v. Harris*, 2012 IL App (1st) 102509-U

 

## K81111 - HARRIS, CARL

Parent Institution:   STATEVILLE CORRECTIONAL CENTER
Offender Status:   RECEPTION
Location:   NORTHERN RECEPTION CENTER

**Sex Offender Registry Required**

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 10/11/1979 |
| Weight: | 187 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 00 in. |
| Race: | Black |
| Eyes: | Brown |

76. *People v. Levi*, 2021 IL App (1st) 160510-UB



**R22724 - LEVI, RAPHAEL**

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location:

**PHYSICAL PROFILE**

Date of Birth: 08/17/1981
Weight: 260 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 02 in.
Race: Black
Eyes: Brown

77. *People v. Buchanan*, 2015 IL App (1st) 132217-U



**B40627 - BUCHANAN, BRIAN**

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

**PHYSICAL PROFILE**

Date of Birth: 12/27/1963
Weight: 220 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Brown

78. *People v. Polk*, 2013 IL App (1st) 112462-U



## M04867 - POLK, DARNELL

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

## PHYSICAL PROFILE

Date of Birth: 05/08/1990
Weight: 197 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

79. *People v. Reed*, 2018 IL App (1st) 152883-U



## M53810 - REED, MICHAEL

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

## PHYSICAL PROFILE

Date of Birth: 06/22/1993
Weight: 176 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

- 109 -

80. *People v. Williams*, 2018 IL App (1st) 160171-U



**B63728 - WILLIAMS, NASHON**

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

**PHYSICAL PROFILE**

Date of Birth: 10/01/1975
Weight: 220 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 06 in.
Race: Black
Eyes: Brown

81. *People v. Lemon*, 2012 IL App (1st) 111150-U



**R41049 - LEMON, DERRICK**

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

**PHYSICAL PROFILE**

Date of Birth: 07/13/1986
Weight: 181 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

82. *People v. Pernell*, 2016 IL App (1st) 133876-U



M41160 - PERNELL, MIKEL

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

**PHYSICAL PROFILE**

Date of Birth: 09/02/1979
Weight: 274 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

83. *People v. McCall*, 2017 IL App (1st) 142945-U



R59845 - MCCALL, DEAJUANN

Parent Institution: SHAWNEE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: SHAWNEE

**PHYSICAL PROFILE**

Date of Birth: 12/14/1987
Weight: 165 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Black

84. *People v. Sanders*, 2020 IL App (1st) 170325-U



**M40607 - SANDERS, ERICK**

Parent Institution:   WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status:   IN CUSTODY
Location:   WESTERN ILLINOIS

## PHYSICAL PROFILE

Date of Birth:   04/07/1995
Weight:   218 lbs.
Hair:   Black
Sex:   Male
Height:   5 ft. 10 in.
Race:   Black
Eyes:   Brown

85. *People v. Anderson*, 2015 IL App (1st) 140131-U



**R63562 - ANDERSON, MARK**

Parent Institution:   SHERIDAN CORRECTIONAL CENTER
Offender Status:   IN CUSTODY
Location:

## PHYSICAL PROFILE

Date of Birth:   12/26/1986
Weight:   155 lbs.
Hair:   Black
Sex:   Male
Height:   5 ft. 09 in.
Race:   Black
Eyes:   Brown

86. *People v. Barner*, 2015 IL 116949



N14389 - BARNER, JOHN

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location:

**Sex Offender Registry Required**

## PHYSICAL PROFILE

Date of Birth: 09/01/1955
Weight: 185 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

87. *People v. Swift*, 2019 IL App (1st) 161106-U



M13598 - SWIFT, DANZEL

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PINCKNEYVILLE

## PHYSICAL PROFILE

Date of Birth: 07/18/1991
Weight: 148 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 10 in.
Race: Black
Eyes: Brown

88. *People v. Jackson*, 2018 IL App (1st) 153559-U



M40957 - JACKSON, TAVARIS M.

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: PAROLE
Location: PAROLE DISTRICT 1

PHYSICAL PROFILE

Date of Birth: 07/15/1995
Weight: 270 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 06 in.
Race: Black
Eyes: Brown

89. *People v. Lewis*, 2015 IL App (1st) 130171



M33598 - LEWIS, SAMUEL

Parent Institution: KEWANEE LIFE SKILLS RE-ENTRY CENTER
Offender Status: IN CUSTODY
Location: KEWANEE

PHYSICAL PROFILE

Date of Birth: 03/23/1976
Weight: 216 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 01 in.
Race: Black
Eyes: Brown

90. *People v. Gibbs*, 2019 IL App (1st) 163132-U



M50043 - GIBBS, MARIO

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

**PHYSICAL PROFILE**

Date of Birth: 01/26/1991
Weight: 265 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 04 in.
Race: Black
Eyes: Brown

91. *People v. Johnson*, 2017 IL App (1st) 141202-U



M43807 - JOHNSON, MICHAEL A.

Parent Institution: STATEVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: STATEVILLE

Sex Offender Registry Required

**PHYSICAL PROFILE**

Date of Birth: 09/05/1985
Weight: 235 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 03 in.
Race: Black
Eyes: Brown

92. *People v. Brock*, 2015 IL App (1st) 133404

| Name: | BROCK, PAUL | | | | | | |
| Alias Name(s): | BROCK, PAUL E | | | | | | |
| Date of Birth: | 2/9/1965 | | | | | | |
| Alias DoB(s): | | | | | | | |
| Height: | 6'02" | Weight: | 267 lbs. | | Sex: | M | Race: | B |
| Address: | Homeless | | | | | | |
| | CHICAGO, IL 00000 | | | | | | |

Crime Information

Sexual Predator  VICTIM WAS 13 YEARS OF AGE
OFFENDER WAS 31 AT THE TIME OF THE OFFENSE

Crimes:  FAILURE TO REPORT CHANGE OF ADDRESS
FAILURE TO REPORT CHANGE OF ADDRESS
INDECENT LIBERTIES WITH A CHILD/SEX
FELONY CONVICTION AFTER 7/1/2011
INDECENT LIBERTIES WITH A CHILD/SEX
AGGRAVATED CRIMINAL SEXUAL ASSAULT/WEAPON
SEX OFFENDER REGISTERING/FALSE INFO
FAIL TO REPORT CHANGE OF ADDRESS/EMPLOYMENT/2ND

County of Conviction:  Cook



93. *People v. Peters*, 2011 IL App (1st) 092839



B17213 - PETERS, JERRY

Parent Institution:  MENARD CORRECTIONAL CENTER
Offender Status:  IN CUSTODY
Location:  MENARD
Sex Offender Registry Required

PHYSICAL PROFILE
Date of Birth:  07/15/1959
Weight:  198 lbs.
Hair:  Black
Sex:  Male
Height:  5 ft. 08 in.
Race:  Black
Eyes:  Brown

94. *People v. Smith*, 2018 IL App (1st) 170008-U



**B76423 - SMITH, ANTONJUAN**

Parent Institution: VIENNA CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: VIENNA

**PHYSICAL PROFILE**

Date of Birth: 12/15/1976
Weight: 199 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 00 in.
Race: Black
Eyes: Brown

95. *People v. Davison*, 2019 IL App (1st) 161094



**R70904 - DAVISON, TERELL**

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

**PHYSICAL PROFILE**

Date of Birth: 06/27/1987
Weight: 201 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Brown

96. *People v. Beasley*, 2014 IL App (1st) 121300-U



N95478 - BEASLEY, LARRY

Parent Institution:        WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status:           IN CUSTODY
Location:                  WESTERN ILLINOIS

**Sex Offender Registry Required**

## PHYSICAL PROFILE

Date of Birth:    12/15/1970
Weight:           230 lbs.
Hair:             Black
Sex:              Male
Height:           5 ft. 11 in.
Race:             Black
Eyes:             Brown

97. *People v. Nugen*, 399 Ill. App. 3d 575 (1st Dist. 2010)



R62320 - NUGEN, WARDELL

Parent Institution:        WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status:           IN CUSTODY
Location:                  WESTERN ILLINOIS

## PHYSICAL PROFILE

Date of Birth:    10/12/1964
Weight:           187 lbs.
Hair:             Black
Sex:              Male
Height:           5 ft. 08 in.
Race:             Black
Eyes:             Brown

- 118 -

98. *People v. Wilson*, 2014 IL App (1st) 113570



M18400 - WILSON, RAYVONNE

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

PHYSICAL PROFILE

Date of Birth: 05/22/1968
Weight: 185 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

99. *People v. Selvie*, 2012 IL App (1st) 102500-U



B34016 - SELVIE, MICHAEL

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PINCKNEYVILLE

PHYSICAL PROFILE

Date of Birth: 09/03/1972
Weight: 315 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

100. *People v. Tatum*, 2019 IL App (1st) 162403



### Y15638 - TATUM, SYLVESTER

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

### PHYSICAL PROFILE

Date of Birth: 12/03/1979
Weight: 310 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 10 in.
Race: Black
Eyes: Brown

101. *People v. Dunn*, 409 Ill. App. 1153 (2011) (table) (unpublished order under Illinois Supreme Court Rule 23)



### M01226 - DUNN, DEMARCUS

Parent Institution: DANVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DANVILLE

### PHYSICAL PROFILE

Date of Birth: 09/27/1988
Weight: 172 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 01 in.
Race: Black
Eyes: Brown

102. *People v. Randall*, 2016 IL App (1st) 143371



### K72456 - RANDALL, TERRELL

Parent Institution: PONTIAC CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PONTIAC

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 08/17/1979 |
| Weight: | 160 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 04 in. |
| Race: | Black |
| Eyes: | Brown |

103. *People v. Clark*, 2012 IL App (1st) 1000066-U



### M10831 - CLARK, RICO

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 11/25/1987 |
| Weight: | 166 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 06 in. |
| Race: | Black |
| Eyes: | Brown |

104. *People v. Cotton*, 393 Ill. App. 3d 237 (1st Dist. 2009)



**B37458 - COTTON, LAVELLE**

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

**PHYSICAL PROFILE**

Date of Birth: 11/21/1971
Weight: 176 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Brown

105. *People v. Williams*, 2020 IL App (1st) 163417



**K73192 - WILLIAMS, JEFFREY**

Parent Institution: DANVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DANVILLE

**PHYSICAL PROFILE**

Date of Birth: 10/13/1980
Weight: 140 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

106. *People v. Lewis*, 2015 IL App (1st) 122411



## N54072 - LEWIS, ANDRE

Parent Institution: STATEVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: STATEVILLE

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 10/25/1966 |
| Weight: | 160 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 10 in. |
| Race: | Black |
| Eyes: | Brown |

107. *People v. Cox*, 377 Ill. App. 3d 690 (1st Dist. 2007)



## R47029 - COX, QUENTION

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: WRIT
Location: COURT

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 07/11/1987 |
| Weight: | 140 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 07 in. |
| Race: | Black |
| Eyes: | Black |

108. *People v. Stewart*, 2020 IL App (1st) 170250-U

Details

Arrest

| | |
|---|---|
| NAME | RODNEY E STEWART |
| AGE | 41 |
| CB NUMBER | 19315115 |

| | |
|---|---|
| ARRESTED | Sunday, May 22, 2016 4:45 PM |
| ARREST LOCATION | 5250 W KINZIE ST |
| ARRESTING AGENCY | CHICAGO POLICE DEPARTMENT |
| RELEASED (AGENCY | Monday, May 23, 2016 6:44 AM |
| DETENTION FACILITY) | |

| | |
|---|---|
| BOND TYPE | |
| BOND AMOUNT | |
| BOND DATE | |

| | |
|---|---|
| AREA | 3 - North |
| DISTRICT | 015 |
| BEAT | 1523 |



109. *People v. Wiley*, 2016 IL App (1st) 140137-U

 

## M41951 - WILEY, MUHAMMAD

| | |
|---|---|
| Parent Institution: | CENTRALIA CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | CENTRALIA |

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 09/06/1995 |
| Weight: | 220 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 07 in. |
| Race: | Black |
| Eyes: | Black |

110. *People v. Henderson*, 2017 IL App (1st) 142259



**M46170 - HENDERSON, RONALD**

Parent Institution: STATEVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: STATEVILLE

**PHYSICAL PROFILE**

Date of Birth: 05/19/1980
Weight: 167 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

111. *People v. Harris*, 2020 IL App (1st) 190690-U



**M44405 - HARRIS, KYJUANZI**

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

**PHYSICAL PROFILE**

Date of Birth: 02/28/1988
Weight: 175 lbs.
Hair: Brown
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

112. *People v. House*, 2014 IL App (1st) 102605-U



**R43611 - HOUSE, JAMES**

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

## PHYSICAL PROFILE

Date of Birth: 07/21/1977
Weight: 192 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

113. *People v. Lee*, 2013 IL App (1st) 111795-U

| Name: | LEE, RODNEY | | | | | | |
|---|---|---|---|---|---|---|---|
| Alias Name(s): | | | | | | | |
| Date of Birth: | 3/17/1968 | | | | | | |
| Alias DoB(s): | | | | | | | |
| Height: | 6'00" | Weight: | 190 lbs. | Sex: | M | Race: | B |
| Address: | Homeless | | | | | | |
| | JOLIET, IL 60432 | | | | | | |

Crime Information

Sexual Predator

VICTIM WAS 16 YEARS OF AGE
OFFENDER WAS 30 AT THE TIME OF THE OFFENSE

Crimes:

AGGRAVATED CRIMINAL SEXUAL ABUSE
FAILURE TO REPORT A CHANGE OF ADDRESS/EMPLOYMENT
FAILURE TO REPORT A CHANGE OF ADDRESS/EMPLOYMENT
FAILURE TO REPORT A CHANGE OF ADDRESS/EMPLOYMENT

County of Conviction: Cook



114. *People v. Johnson*, 2012 IL App (1st) 091324-U



**R43615 - JOHNSON, JAMES**

| | |
|---|---|
| Parent Institution: | LAWRENCE CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | LAWRENCE CORRECTIONAL CENTER |

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 10/21/1980 |
| Weight: | 175 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 07 in. |
| Race: | Black |
| Eyes: | Brown |

115. *People v. Baker*, 2023 IL App (1st) 211588-U



**R29601 - BAKER, DWAYNE**

| | |
|---|---|
| Parent Institution: | MENARD CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | MENARD |

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 09/23/1982 |
| Weight: | 213 lbs. |
| Hair: | Brown |
| Sex: | Male |
| Height: | 6 ft. 01 in. |
| Race: | Black |
| Eyes: | Brown |

116. *People v.*
*Bradley*, 2023
IL App (1st)
190948-U



Y35713 - BRADLEY, ANTHONY

Parent Institution:     STATEVILLE CORRECTIONAL CENTER
Offender Status:        PAROLE
Location:               PAROLE DISTRICT 1

PHYSICAL PROFILE

Date of Birth:          08/06/1990
Weight:                 222 lbs.
Hair:                   Black
Sex:                    Male
Height:                 5 ft. 11 in.
Race:                   Black
Eyes:                   Brown

117. *People v.*
*Carter*, 2023
IL App (1st)
220491-U
(defendant
Kelvin Carter)



K57777 - CARTER, KELVIN

Parent Institution:     PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status:        IN CUSTODY
Location:               PINCKNEYVILLE

PHYSICAL PROFILE

Date of Birth:          10/13/1978
Weight:                 198 lbs.
Hair:                   Black
Sex:                    Male
Height:                 5 ft. 08 in.
Race:                   Black
Eyes:                   Brown

118. *People v. Davis*, 2023 IL App (1st) 211469-U



**M27481 - DAVIS, CEDRYCK**

Parent Institution: JOLIET TREATMENT CENTER
Offender Status: IN CUSTODY
Location:

**PHYSICAL PROFILE**

Date of Birth: 02/18/1991
Weight: 164 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

119. *People v. Dorsey*, 2023 IL App (1st) 200304



**Y41003 - DORSEY, JERRELL**

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PINCKNEYVILLE

**PHYSICAL PROFILE**

Date of Birth: 02/10/1986
Weight: 160 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

120. *People v. Erwin*, 2023 IL App (1st) 200936



**R57260 - ERWIN, DEAUNTE**

Parent Institution: DIXON CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: DIXON

**PHYSICAL PROFILE**

Date of Birth: 09/04/1978
Weight: 190 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 06 in.
Race: Black
Eyes: Brown

121. *People v. Gill*, 2023 IL App (1st) 201109-U



**Y41866 - GILL, ERICK**

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

**PHYSICAL PROFILE**

Date of Birth: 11/14/1991
Weight: 250 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 06 in.
Race: Black
Eyes: Brown

122. *People v. Hawkins*, 2023 IL App (1st) 220604-U



**M01180 - HAWKINS, TERRY**

Parent Institution: CENTRALIA CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: CENTRALIA

**Sex Offender Registry Required**

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 09/04/1969 |
| Weight: | 190 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 08 in. |
| Race: | Black |
| Eyes: | Brown |

123. *People v. Jackson*, 2023 IL App (1st) 200017-U



**Y40207 - JACKSON, JOVAN**

Parent Institution: JOLIET TREATMENT CENTER
Offender Status: IN CUSTODY
Location:

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 06/06/1991 |
| Weight: | 200 lbs. |
| Hair: | Brown |
| Sex: | Male |
| Height: | 5 ft. 07 in. |
| Race: | Black |
| Eyes: | Brown |

124. *People v. Massey*, 2023 IL App (1st) 220123



## Y14682 - MASSEY, CLINT

Parent Institution: WESTERN ILLINOIS CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: WESTERN ILLINOIS

**PHYSICAL PROFILE**

Date of Birth: 02/18/1997
Weight: 155 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

125. *People v. Murphy*, 2023 IL App (1st) 221553-U



## R71059 - MURPHY, JAMELL

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

**PHYSICAL PROFILE**

Date of Birth: 06/08/1980
Weight: 275 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 01 in.
Race: Black
Eyes: Brown

126. *People v. Randall*, 2023 IL App (1st) 220689-U



## K72456 - RANDALL, TERRELL

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

### PHYSICAL PROFILE

Date of Birth: 08/17/1979
Weight: 165 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 04 in.
Race: Black
Eyes: Brown

127. *People v. Spencer*, 2023 IL App (1st) 200646-U



## Y41721 - SPENCER, EUGENE

Parent Institution: PONTIAC CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location:

### PHYSICAL PROFILE

Date of Birth: 09/24/1991
Weight: 217 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 00 in.
Race: Black
Eyes: Brown

128. *People v. Streater*, 2023 IL App (1st) 220640



R03820 - STREATER, WILLIE

**Parent Institution:** PONTIAC CORRECTIONAL CENTER
**Offender Status:** IN CUSTODY
**Location:** PONTIAC

**Sex Offender Registry Required**

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 08/19/1962 |
| Weight: | 193 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 08 in. |
| Race: | Black |
| Eyes: | Brown |

129. *People v. Tyler*, 2023 IL App (1st) 181821-U



Y30672 - TYLER, MATTHEW

**Parent Institution:** WESTERN ILLINOIS CORRECTIONAL CENTER
**Offender Status:** IN CUSTODY
**Location:** WESTERN ILLINOIS

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 11/16/1989 |
| Weight: | 185 lbs. |
| Hair: | Brown |
| Sex: | Male |
| Height: | 5 ft. 10 in. |
| Race: | Black |
| Eyes: | Brown |

130. *People v. Ward*, 2023 IL App (1st) 190364



Y34150 - WARD, MICHEAIL

Parent Institution: PONTIAC CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PONTIAC

**PHYSICAL PROFILE**

Date of Birth: 08/09/1994
Weight: 219 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Black
Eyes: Brown

131. *People v. Wilson*, 2023 IL App (1st) 200702-U



Y41192 - WILSON, QAWMANE

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**PHYSICAL PROFILE**

Date of Birth: 12/03/1989
Weight: 126 lbs.
Hair: Brown
Sex: Male
Height: 5 ft. 03 in.
Race: Black
Eyes: Not Available

132. *People v. Wimberly*, 2023 IL App (1st) 220809



R50509 - WIMBERLY, DARRELL

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PINCKNEYVILLE

**PHYSICAL PROFILE**

Date of Birth: 11/20/1985
Weight: 185 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

133. *People v. Charles*, 2022 IL App (1st) 210247-U



M54753 - CHARLES, JAMAAL

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER
**Sex Offender Registry Required**

**PHYSICAL PROFILE**

Date of Birth: 03/15/1987
Weight: 180 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Black
Eyes: Brown

134. *People v. Ivy*, 2022 IL App (1st) 191702-U



## K96604 - IVY, TERRELL

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

### PHYSICAL PROFILE

Date of Birth: 12/26/1978
Weight: 208 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 01 in.
Race: Black
Eyes: Brown

135. *People v. Joseph*, 2022 IL App (1st) 192051-U



## Y22155 - JOSEPH, LEONDO

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: WRIT
Location: COURT

**Sex Offender Registry Required**

### PHYSICAL PROFILE

Date of Birth: 08/06/1976
Weight: 180 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 10 in.
Race: Black
Eyes: Brown

136. *People v. McCray*, 2022 IL App (1st) 191099-U



### R63745 - MCCRAY, NATHANIEL

Parent Institution:    STATEVILLE CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    STATEVILLE

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 12/29/1980 |
| Weight: | 200 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 03 in. |
| Race: | Black |
| Eyes: | Brown |

137. *People v. Mohamed*, 2022 IL App (1st) 210189-U



### M19608 - MOHAMED, ELEMO

Parent Institution:    HILL CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    HILL

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 01/15/1992 |
| Weight: | 160 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 09 in. |
| Race: | Black |
| Eyes: | Brown |

138. *People v. Pierce*, 2022 IL App (1st) 201040-U



## R61521 - PIERCE, SHAROD P.

**Parent Institution:** STATEVILLE CORRECTIONAL CENTER
**Offender Status:** IN CUSTODY
**Location:** STATEVILLE

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 06/27/1987 |
| Weight: | 173 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 00 in. |
| Race: | Black |
| Eyes: | Brown |

139. *People v. Rush*, 2022 IL App (1st) 200656-U



## R70896 - RUSH, TERRANCE

**Parent Institution:** MENARD CORRECTIONAL CENTER
**Offender Status:** IN CUSTODY
**Location:** MENARD

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 04/06/1984 |
| Weight: | 199 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 6 ft. 02 in. |
| Race: | Black |
| Eyes: | Brown |

140. *People v. Smith*, 2022 IL App (1st) 190691 (defendant Aaron Smith)



**Y35418 - SMITH, AARON**

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**PHYSICAL PROFILE**

Date of Birth: 12/30/1985
Weight: 202 lbs.
Hair: Brown
Sex: Male
Height: 5 ft. 08 in.
Race: Black
Eyes: Brown

141. *People v. Starks*, 2022 IL App (1st) 190587-U



**M27220 - STARKS, BRANDON**

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

**PHYSICAL PROFILE**

Date of Birth: 04/30/1987
Weight: 177 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 00 in.
Race: Black
Eyes: Brown

142. *People v. Walker*, 2022 IL App (1st) 210508-U



## M32755 - WALKER, JUSTIN

Parent Institution: PINCKNEYVILLE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PINCKNEYVILLE

### PHYSICAL PROFILE

Date of Birth: 10/15/1990
Weight: 180 lbs.
Hair: Brown
Sex: Male
Height: 6 ft. 04 in.
Race: Black
Eyes: Brown

143. *People v. Washington*, 2022 IL App (1st) 200638-U



## R32363 - WASHINGTON, TERRELL

Parent Institution: SHERIDAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: SHERIDAN

### PHYSICAL PROFILE

Date of Birth: 09/10/1980
Weight: 178 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Black
Eyes: Brown

144. *People v. Wright*, 2022 IL App (1st) 210301-U



### A51322 - WRIGHT, HARVEY

**Parent Institution:** PONTIAC CORRECTIONAL CENTER
**Offender Status:** IN CUSTODY
**Location:** PONTIAC

**Sex Offender Registry Required**

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 05/13/1957 |
| Weight: | 187 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 11 in. |
| Race: | Black |
| Eyes: | Brown |

145. *People v. Smith*, 2021 IL App (1st) 190421 (defendant Rashawn Smith)



### M27168 - SMITH, RASHAWN T.

**Parent Institution:** WESTERN ILLINOIS CORRECTIONAL CENTER
**Offender Status:** IN CUSTODY
**Location:** WESTERN ILLINOIS

### PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 12/27/1993 |
| Weight: | 221 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 11 in. |
| Race: | Black |
| Eyes: | Brown |

<u>No Picture—Witness in Case Identified Defendant as Black</u>

146. *People v. Carter*, 2023 IL App (1st) 200093-U (defendant Anton Carter)

147. *People v. Williams*, 2023 IL App (1st) 192463

148. *Van Buren v. City of Chicago*, 2023 IL App (1st) 220525-U

149. *In re J.A.*, 2019 IL App (1st) 181763-U (minor defendant)

150. *In re Antoine H.*, 2016 IL App (1st) 152677-U (minor defendant)

151. *People v. Thomas*, 2016 IL App (1st) 141040

152. *People v. Ferguson*, 2014 IL App (1st) 121614-U

<u>Black Females</u>

153. *People v. Moore*, 2019 IL App (1st) 180735-U





154. *People v. Carr-McKnight*, 2020 IL App (1st) 163245



## Y12536 - CARR-MCKNIGHT, AMELIA

Parent Institution: LOGAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LOGAN

## PHYSICAL PROFILE

Date of Birth: 04/26/1972
Weight: 213 lbs.
Hair: Black
Sex: Female
Height: 5 ft. 02 in.
Race: Bi-Racial
Eyes: Black

<u>Latinx Males</u>

155. *People v. Garcia*, 2021 IL App (1st) 192576-U



Y38670 - GARCIA, GIOVANNI

Parent Institution: PONTIAC CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PONTIAC

**PHYSICAL PROFILE**

Date of Birth: 11/11/1995
Weight: 205 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 11 in.
Race: Hispanic
Eyes: Brown

156. *People v. Velez*, 2011 IL App (1st) 101650-U



R50938 - VELEZ, VICTOR

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**PHYSICAL PROFILE**

Date of Birth: 02/17/1982
Weight: 170 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 04 in.
Race: Hispanic
Eyes: Brown

157. *People v. Lerma*, 2021 IL App (1st) 181480



## M28860 - LERMA, EDUARDO

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

## PHYSICAL PROFILE

Date of Birth: 01/29/1979
Weight: 170 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Hispanic
Eyes: Brown

158. *People v. Perez*, 2021 IL App (1st) 181400-U

## Details

Arrest



NAME VICTOR PEREZ
AGE 29
CB NUMBER 19222349

ARRESTED Saturday, November 14, 2015 12:00 PM
ARREST LOCATION 2931 W LUIS MUNOZ MARIN DR N
ARRESTING AGENCY CHICAGO POLICE DEPARTMENT
RELEASED (AGENCY
DETENTION FACILITY) Sunday, November 15, 2015 6:00 AM

BOND TYPE
BOND AMOUNT
BOND DATE

AREA 3 - North
DISTRICT 014
BEAT 1423

History

159. *People v. Cano*, 2020 IL App (1st) 182100-U



M40291 - CANO, SAMMY

Parent Institution: BIG MUDDY CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: BIG MUDDY RIVER

**Sex Offender Registry Required**

PHYSICAL PROFILE

Date of Birth: 09/05/1973
Weight: 158 lbs.
Hair: Brown
Sex: Male
Height: 5 ft. 03 in.
Race: Hispanic
Eyes: Brown

160. *People v. Bahena*, 2020 IL App (1st) 180197



Y26870 - BAHENA, SERGIO

Parent Institution: LAWRENCE CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LAWRENCE CORRECTIONAL CENTER

PHYSICAL PROFILE

Date of Birth: 09/21/1992
Weight: 235 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Hispanic
Eyes: Brown

161. *People v. Ruiz*, 2020 IL App (1st) 171436-U



**Y21829 - RUIZ, MARTIN**

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**PHYSICAL PROFILE**

Date of Birth: 08/17/1988
Weight: 240 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Hispanic
Eyes: Brown

162. *People v. Resendiz*, 2020 IL App (1st) 180821



**Y16452 - RESENDIZ, JOSE**

Parent Institution: ILLINOIS RIVER CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: ILLINOIS RIVER

**Sex Offender Registry Required**

**PHYSICAL PROFILE**

Date of Birth: 06/21/1972
Weight: 150 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 02 in.
Race: Hispanic
Eyes: Brown

163. *People v. Alicea*, 2013 IL App (1st) 112602



Mugshots.com : 4596558
DOC Number : M22673
Parent Institution : VANDALIA CORRECTIONAL CENTER
Inmate Status : IN CUSTODY
Location : VANDALIA
Birth date : 12/24/1957
Weight : 165 lb (75 kg)
Hair Color : Black
Gender : Male
Height : 5' 8" (1.73 m)
Race : Hispanic
Eye Color : Brown
Admission Date : 7/26/2011
Projected Parole Date : 1/16/2015
Last Paroled Date : N/A
Projected Discharge Date : 1/16/2015
Scars / Marks / Tattoos : N/A

164. *People v. Sepulveda*, 2018 IL App (1st) 153626-U



M55253 - SEPULVEDA, SALVADOR

Parent Institution:      SHAWNEE CORRECTIONAL CENTER
Offender Status:         IN CUSTODY
Location:                SHAWNEE
                 **Sex Offender Registry Required**

**PHYSICAL PROFILE**
Date of Birth:    08/02/1969
Weight:           170 lbs.
Hair:             Black
Sex:              Male
Height:           5 ft. 04 in.
Race:             Hispanic
Eyes:             Brown

165. *People v. Rodriguez*, 2020 IL App (1st) 171200-U



## K76536 - RODRIGUEZ, DANIEL

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

### PHYSICAL PROFILE

Date of Birth: 03/27/1982
Weight: 175 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 08 in.
Race: Hispanic
Eyes: Brown

166. *People v. Andrade*, 2018 IL App (1st) 151651-U



## M27374 - ANDRADE, CARLOS

Parent Institution: CENTRALIA CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: CENTRALIA

### PHYSICAL PROFILE

Date of Birth: 11/20/1990
Weight: 236 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 09 in.
Race: Hispanic
Eyes: Brown

167. *People v. Ascencio*, 2019 IL App (1st) 161693-U



M05248 - ASCENCIO, RICHARD

Parent Institution: EAST MOLINE CORRECTIONAL CENTER
Offender Status: PAROLE
Location: PAROLE DISTRICT 1

**Sex Offender Registry Required**

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 08/11/1990 |
| Weight: | 150 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 05 in. |
| Race: | Hispanic |
| Eyes: | Brown |

168. *People v. Soto*, 2015 IL App (1st) 132367-U



M38274 - SOTO, JAVIER

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 02/24/1988 |
| Weight: | 225 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 05 in. |
| Race: | Hispanic |
| Eyes: | Brown |

169. *People v. Castillo*, 2014 IL App (1st) 122620-U



M30929 - CASTILLO, MIGUEL

Parent Institution: HILL CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: HILL

**Sex Offender Registry Required**

## PHYSICAL PROFILE

Date of Birth: 08/28/1968
Weight: 160 lbs.
Hair: Brown
Sex: Male
Height: 5 ft. 07 in.
Race: Hispanic
Eyes: Brown

170. *People v. Aguilar*, 396 Ill. App. 3d 43 (1st Dist. 2009)



R66488 - AGUILAR, EFREN

Parent Institution: MENARD CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: MENARD

## PHYSICAL PROFILE

Date of Birth: 02/16/1987
Weight: 177 lbs.
Hair: Brown
Sex: Male
Height: 6 ft. 01 in.
Race: Hispanic
Eyes: Brown

171. *People v. Gomez*, 2023 IL App (1st) 211019-U



**M09190 - GOMEZ, GEORGE**

Parent Institution:    HILL CORRECTIONAL CENTER
Offender Status:    IN CUSTODY
Location:    HILL

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 06/12/1986 |
| Weight: | 150 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 09 in. |
| Race: | Hispanic |
| Eyes: | Brown |

172. *People v. Davila*, 2022 IL App (1st) 190882



**Y35715 - DAVILA, ARCADIO**

Parent Institution:    STATEVILLE CORRECTIONAL CENTER
Offender Status:    PAROLE
Location:    PAROLE DISTRICT 1

**PHYSICAL PROFILE**

| | |
|---|---|
| Date of Birth: | 11/07/1988 |
| Weight: | 268 lbs. |
| Hair: | Brown |
| Sex: | Male |
| Height: | 5 ft. 06 in. |
| Race: | Hispanic |
| Eyes: | Brown |

173. *People v. Petatan*, 2015 IL App (1st) 132522-U



M38074 - PETATAN, ODILON

Parent Institution: PONTIAC CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: PONTIAC

PHYSICAL PROFILE
Date of Birth: 09/26/1983
Weight: 147 lbs.
Hair: Black
Sex: Male
Height: 5 ft. 07 in.
Race: Hispanic
Eyes: Brown

White Female

174. *People v. Wright*, 2013 IL App (1st) 113777-U



R87672 - WRIGHT, KRISTY

Parent Institution: LOGAN CORRECTIONAL CENTER
Offender Status: IN CUSTODY
Location: LOGAN

PHYSICAL PROFILE
Date of Birth: 06/23/1987
Weight: 179 lbs.
Hair: Brown
Sex: Female
Height: 5 ft. 08 in.
Race: White
Eyes: Hazel

<u>No Picture, No Witness Identification, Crime in Black Neighborhood</u>

175. *People v. Holmes*, 2016 IL App (1st) 141210-U

176. *People v. Jones*, 2015 IL App (1st) 142997

177. *People v. Rankin*, 2015 IL App (1st) 133409

178. *People v. Alexander*, 2014 IL App (1st) 121794-U

179. *People v. Dennis*, 2014 IL App (1st) 112936-UB

180. *People v. Henderson*, 2014 IL App (1st) 120935-U

181. *People v. Allen*, 2012 IL App (1st) 111656-U

182. *People v. McGee*, 2012 IL App (1st) 102364-UB

183. *In re Dante W.*, 383 Ill. App. 3d 401 (1st Dist. 2008) (minor defendant)